**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

FAIR HOUSING COUNCIL OF SAN
FERNANDO VALLEY; THE FAIR
HOUSING COUNCIL OF SAN DIEGO,
individually and on behalf of the
GENERAL PUBLIC,
    *Plaintiffs-Appellants,*

  v.

ROOMMATES.COM, LLC,
    *Defendant-Appellee.*

No. 04-56916

D.C. No.
CV-03-09386-PA

FAIR HOUSING COUNCIL OF SAN
FERNANDO VALLEY; THE FAIR
HOUSING COUNCIL OF SAN DIEGO,
individually and on behalf of the
GENERAL PUBLIC,
    *Plaintiffs-Appellees,*

  v.

ROOMMATE.COM, LLC,
    *Defendant-Appellant.*

No. 04-57173

D.C. No.
CV-03-09386-PA

OPINION

Appeal from the United States District Court
for the Central District of California
Percy Anderson, District Judge, Presiding

Argued and Submitted
December 12, 2007—Pasadena, California

Filed April 3, 2008

Before: Alex Kozinski, Chief Judge, Stephen Reinhardt,
Pamela Ann Rymer, Barry G. Silverman,
M. Margaret McKeown, William A. Fletcher,
Raymond C. Fisher, Richard A. Paez, Carlos T. Bea,
Milan D. Smith, Jr. and N. Randy Smith, Circuit Judges.

Opinion by Chief Judge Kozinski;
Partial Concurrence and Partial Dissent by Judge McKeown

## COUNSEL

Michael Evans, Pescadero, California; Christopher Brancart, Brancart & Brancart, Pescadero, California; Gary Rhoades, Rhoades & Al-Mansour, Los Angeles, California, for the plaintiffs-appellants/cross-appellees.

Timothy L. Alger, Kent J. Bullard, Steven B. Stiglitz and Lesley E. Williams, Quinn Emanuel Urquhart Oliver & Hedges, LLP, Los Angeles, California, for the defendant-appellee/cross-appellant.

Kelli L. Sager, Los Angeles, California; Thomas R. Burke, San Francisco, California; Bruce E. H. Johnson and Ambika K. Doran, Davis Wright Tremaine LLP, Seattle, Washington,

for News Organizations as amici curiae in support of the defendant-appellee.

Ann Brick, Margaret C. Crosby and Nicole A. Ozer, American Civil Liberties Union Foundation of Northern California, San Francisco, California, for American Civil Liberties Union of Northern California as amicus curiae in support of neither party.

John P. Relman, Stephen M. Dane and D. Scott Chang, Relman & Dane PLLC, Washington, DC; Joseph D. Rich and Nicole Birch, Lawyers' Committee for Civil Rights Under Law, Washington, DC, for National Fair Housing Alliance and Lawyers' Committee for Civil Rights Under Law as amici curiae in support of the plaintiffs-appellants.

---

## OPINION

KOZINSKI, Chief Judge:

We plumb the depths of the immunity provided by section 230 of the Communications Decency Act of 1996 ("CDA").

## Facts[1]

Defendant Roommate.com, LLC ("Roommate") operates a website designed to match people renting out spare rooms with people looking for a place to live.[2] At the time of the district court's disposition, Roommate's website featured approximately 150,000 active listings and received around a

---

[1]This appeal is taken from the district court's order granting defendant's motion for summary judgment, so we view contested facts in the light most favorable to plaintiffs. *See Winterrowd* v. *Nelson*, 480 F.3d 1181, 1183 n.3 (9th Cir. 2007).

[2]For unknown reasons, the company goes by the singular name "Roommate.com, LLC" but pluralizes its website's URL, www.roommates.com.

million page views a day. Roommate seeks to profit by collecting revenue from advertisers and subscribers.

Before subscribers can search listings or post[3] housing opportunities on Roommate's website, they must create profiles, a process that requires them to answer a series of questions. In addition to requesting basic information—such as name, location and email address—Roommate requires each subscriber to disclose his sex, sexual orientation and whether he would bring children to a household. Each subscriber must also describe his preferences in roommates with respect to the same three criteria: sex, sexual orientation and whether they will bring children to the household. The site also encourages subscribers to provide "Additional Comments" describing themselves and their desired roommate in an open-ended essay. After a new subscriber completes the application, Roommate assembles his answers into a "profile page." The profile page displays the subscriber's pseudonym, his description and his preferences, as divulged through answers to Roommate's questions.

Subscribers can choose between two levels of service: Those using the site's free service level can create their own personal profile page, search the profiles of others and send personal email messages. They can also receive periodic emails from Roommate, informing them of available housing opportunities matching their preferences. Subscribers who pay a monthly fee also gain the ability to read emails from other users, and to view other subscribers' "Additional Comments."

The Fair Housing Councils of the San Fernando Valley and San Diego ("Councils") sued Roommate in federal court, alleging that Roommate's business violates the federal Fair

---

[3]In the online context, "posting" refers to providing material that can be viewed by other users, much as one "posts" notices on a physical bulletin board.

Housing Act ("FHA"), 42 U.S.C. § 3601 *et seq.*, and California housing discrimination laws.[4] Councils claim that Roommate is effectively a housing broker doing online what it may not lawfully do off-line. The district court held that Roommate is immune under section 230 of the CDA, 47 U.S.C. § 230(c), and dismissed the federal claims without considering whether Roommate's actions violated the FHA. The court then declined to exercise supplemental jurisdiction over the state law claims. Councils appeal the dismissal of the FHA claim and Roommate cross-appeals the denial of attorneys' fees.

## Analysis

[1] Section 230 of the CDA[5] immunizes providers of interactive computer services[6] against liability arising from content created by third parties: "No provider . . . of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c).[7] This grant of immunity

---

[4]The Fair Housing Act prohibits certain forms of discrimination on the basis of "race, color, religion, sex, familial status, or national origin." 42 U.S.C. § 3604(c). The California fair housing law prohibits discrimination on the basis of "sexual orientation, marital status, . . . ancestry, . . . source of income, or disability," in addition to reiterating the federally protected classifications. Cal. Gov. Code § 12955.

[5]The Supreme Court held some portions of the CDA to be unconstitutional. *See Reno* v. *ACLU*, 521 U.S. 844 (1997). The portions relevant to this case are still in force.

[6]Section 230 defines an "interactive computer service" as "any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server." 47 U.S.C. § 230(f)(2); *see Carafano* v. *Metrosplash.com, Inc.*, 207 F. Supp. 2d 1055, 1065-66 (C.D. Cal. 2002) (an online dating website is an "interactive computer service" under the CDA), *aff'd*, 339 F.3d 1119 (9th Cir. 2003). Today, the most common interactive computer services are websites. Councils do not dispute that Roommate's website is an interactive computer service.

[7]The Act also gives immunity to users of third-party content. This case does not involve any claims against users so we omit all references to user immunity when quoting and analyzing the statutory text.

applies only if the interactive computer service provider is not also an "information content provider," which is defined as someone who is "responsible, in whole or in part, for the creation or development of" the offending content. *Id.* § 230(f)(3).

**[2]** A website operator can be both a service provider and a content provider: If it passively displays content that is created entirely by third parties, then it is only a service provider with respect to that content. But as to content that it creates itself, or is "responsible, in whole or in part" for creating or developing, the website is also a content provider. Thus, a website may be immune from liability for some of the content it displays to the public but be subject to liability for other content.[8]

Section 230 was prompted by a state court case holding Prodigy[9] responsible for a libelous message posted on one of its financial message boards.[10] *See Stratton Oakmont, Inc.* v. *Prodigy Servs. Co.*, 1995 WL 323710 (N.Y. Sup. Ct. May 24, 1995) (unpublished). The court there found that Prodigy had become a "publisher" under state law because it voluntarily deleted some messages from its message boards "on the basis of offensiveness and 'bad taste,' " and was therefore legally responsible for the content of defamatory messages that it failed to delete. *Id.* at *4. The *Stratton Oakmont* court reasoned that Prodigy's decision to perform some voluntary self-policing made it akin to a newspaper publisher, and thus

---

[8]*See, e.g.*, *Anthony* v. *Yahoo! Inc.*, 421 F. Supp. 2d 1257, 1262-63 (N.D. Cal. 2006) (Yahoo! is not immune under the CDA for allegedly creating fake profiles on its own dating website).

[9]Prodigy was an online service provider with 2 million users, which seemed like a lot at the time.

[10]A "message board" is a system of online discussion allowing users to "post" messages. Messages are organized by topic—such as the "finance" message board at issue in *Stratton Oakmont*—and the system generally allows users to read and reply to messages posted by others.

responsible for messages on its bulletin board that defamed third parties. The court distinguished Prodigy from Compu-Serve,[11] which had been released from liability in a similar defamation case because CompuServe "had no opportunity to review the contents of the publication at issue before it was uploaded into CompuServe's computer banks." *Id.*; *see Cubby, Inc.* v. *CompuServe, Inc.*, 776 F. Supp. 135, 140 (S.D.N.Y. 1991). Under the reasoning of *Stratton Oakmont*, online service providers that voluntarily filter some messages become liable for all messages transmitted, whereas providers that bury their heads in the sand and ignore problematic posts altogether escape liability. Prodigy claimed that the "sheer volume" of message board postings it received—at the time, over 60,000 a day—made manual review of every message impossible; thus, if it were forced to choose between taking responsibility for all messages and deleting no messages at all, it would have to choose the latter course. *Stratton Oakmont*, 1995 WL 323710 at *3.

**[3]** In passing section 230, Congress sought to spare interactive computer services this grim choice by allowing them to perform some editing on user-generated content without thereby becoming liable for all defamatory or otherwise unlawful messages that they didn't edit or delete. In other words, Congress sought to immunize the *removal* of user-generated content, not the *creation* of content: "[S]ection [230] provides 'Good Samaritan' protections from civil liability for providers . . . of an interactive computer service for actions to *restrict* . . . access to objectionable online material. One of the specific purposes of this section is to overrule *Stratton-Oakmont* [sic] v. *Prodigy* and any other similar decisions which have treated such providers . . . as publishers or speakers of content that is not their own *because they have restricted access* to objectionable material." H.R. Rep. No. 104-458 (1996) (Conf. Rep.), *as reprinted in* 1996

---

[11]CompuServe was a competing online service provider of the day.

U.S.C.C.A.N. 10 (emphasis added).[12] Indeed, the section is titled "Protection for 'good samaritan' blocking and screening of offensive material" and, as the Seventh Circuit recently held, the substance of section 230(c) can and should be interpreted consistent with its caption. *Chicago Lawyers' Committee for Civil Rights Under Law, Inc.* v. *craigslist, Inc.*, No. 07-1101, slip op. at 6 (7th Cir. Mar. 14, 2008) (quoting *Doe* v. *GTE Corp.*, 347 F.3d 655, 659-60 (7th Cir. 2003)).

With this backdrop in mind, we examine three specific functions performed by Roommate that are alleged to violate the Fair Housing Act and California law.

**1.** Councils first argue that the questions Roommate poses to prospective subscribers during the registration process violate the Fair Housing Act and the analogous California law. Councils allege that requiring subscribers to disclose their sex, family status and sexual orientation "indicates" an intent to discriminate against them, and thus runs afoul of both the FHA and state law.[13]

[4] Roommate created the questions and choice of answers, and designed its website registration process around them. Therefore, Roommate is undoubtedly the "information content provider" as to the questions and can claim no immunity

---

[12]While the Conference Report refers to this as "[o]ne of the specific purposes" of section 230, it seems to be the principal or perhaps the only purpose. The report doesn't describe any other purposes, beyond supporting "the important federal policy of empowering parents to determine the content of communications their children receive through interactive computer services." H.R. Rep. No. 104-458, at 194 (1996) (Conf. Rep.), *as reprinted in* 1996 U.S.C.C.A.N. 10, 207-08.

[13]The Fair Housing Act prohibits any "statement . . . with respect to the sale or rental of a dwelling that *indicates . . . an intention* to make [a] preference, limitation, or discrimination" on the basis of a protected category. 42 U.S.C. § 3604(c) (emphasis added). California law prohibits "any written or oral inquiry concerning the" protected status of a housing seeker. Cal. Gov. Code § 12955(b).

for posting them on its website, or for forcing subscribers to answer them as a condition of using its services.

Here, we must determine whether Roommate has immunity under the CDA because Councils have at least a plausible claim that Roommate violated state and federal law by merely posing the questions. We need not decide whether any of Roommate's questions actually violate the Fair Housing Act or California law, or whether they are protected by the First Amendment or other constitutional guarantees, *see craigslist*, slip op. at 2; we leave those issues for the district court on remand. Rather, we examine the scope of plaintiffs' substantive claims only insofar as necessary to determine whether section 230 immunity applies. However, we note that asking questions certainly *can* violate the Fair Housing Act and analogous laws in the physical world.[14] For example, a real estate broker may not inquire as to the race of a prospective buyer, and an employer may not inquire as to the religion of a prospective employee. If such questions are unlawful when posed face-to-face or by telephone, they don't magically become lawful when asked electronically online. The Communications Decency Act was not meant to create a lawless no-man's-land on the Internet.[15]

**[5]** Councils also claim that requiring subscribers to answer

---

[14]The Seventh Circuit has expressly held that inquiring into the race and family status of housing applicants is unlawful. *See, e.g.*, *Jancik* v. *HUD*, 44 F.3d 553, 557 (7th Cir. 1995).

[15]The dissent stresses the importance of the Internet to modern life and commerce, Dissent at 3476, and we, of course, agree: The Internet is no longer a fragile new means of communication that could easily be smothered in the cradle by overzealous enforcement of laws and regulations applicable to brick-and-mortar businesses. Rather, it has become a dominant—perhaps the preeminent—means through which commerce is conducted. And its vast reach into the lives of millions is exactly why we must be careful not to exceed the scope of the immunity provided by Congress and thus give online businesses an unfair advantage over their real-world counterparts, which must comply with laws of general applicability.

the questions as a condition of using Roommate's services unlawfully "cause[s]" subscribers to make a "statement . . . with respect to the sale or rental of a dwelling that indicates [a] preference, limitation, or discrimination," in violation of 42 U.S.C. § 3604(c). The CDA does not grant immunity for inducing third parties to express illegal preferences. Roommate's own acts—posting the questionnaire and requiring answers to it—are entirely its doing and thus section 230 of the CDA does not apply to them. Roommate is entitled to no immunity.[16]

**[6] 2.** Councils also charge that Roommate's development and display of subscribers' discriminatory preferences is unlawful. Roommate publishes a "profile page" for each subscriber on its website. The page describes the client's personal information—such as his sex, sexual orientation and whether he has children—as well as the attributes of the housing situation he seeks. The content of these pages is drawn directly from the registration process: For example, Roommate requires subscribers to specify, using a drop-down menu[17] provided by Roommate, whether they are "Male" or "Female" and then displays that information on the profile page. Roommate also requires subscribers who are listing available housing to disclose whether there are currently "Straight male(s)," "Gay male(s)," "Straight female(s)" or "Lesbian(s)" living in the dwelling. Subscribers who are seeking housing must make a selection from a drop-down menu, again provided by Roommate, to indicate whether they are willing to live with "Straight or gay" males, only with "Straight" males, only with "Gay" males or with "No males." Similarly, Roommate

---

[16]Roommate argues that Councils waived the argument that the questionnaire violated the FHA by failing to properly raise it in the district court. But, under our liberal pleading standard, it was sufficient for Councils in their First Amended Complaint to allege that Roommate "encourages" subscribers to state discriminatory preferences. *See Johnson* v. *Barker*, 799 F.2d 1396, 1401 (9th Cir. 1986).

[17]A drop-down menu allows a subscriber to select answers only from among options provided by the website.

requires subscribers listing housing to disclose whether there are "Children present" or "Children not present" and requires housing seekers to say "I will live with children" or "I will not live with children." Roommate then displays these answers, along with other information, on the subscriber's profile page. This information is obviously included to help subscribers decide which housing opportunities to pursue and which to bypass. In addition, Roommate itself uses this information to channel subscribers away from listings where the individual offering housing has expressed preferences that aren't compatible with the subscriber's answers.

[7] The dissent tilts at windmills when it shows, quite convincingly, that Roommate's *subscribers* are information content providers who create the profiles by picking among options and providing their own answers. Dissent at 3485-88. There is no disagreement on this point. But, the fact that users are information content providers does not preclude Roommate from *also* being an information content provider by helping "develop" at least "in part" the information in the profiles. As we explained in *Batzel*, the party responsible for putting information online may be subject to liability, even if the information originated with a user. *See Batzel* v. *Smith*, 333 F.3d 1018, 1033 (9th Cir. 2003).[18]

[8] Here, the part of the profile that is alleged to offend the Fair Housing Act and state housing discrimination laws—the information about sex, family status and sexual orientation—is provided by subscribers in response to Roommate's questions, which they cannot refuse to answer if they want to use defendant's services. By requiring subscribers to provide the information as a condition of accessing its service, and by providing a limited set of pre-populated answers, Roommate becomes much more than a passive transmitter of information provided by others; it becomes the developer, at least in part, of that information. And section 230 provides immunity only

---

[18]*See also* discussion of *Batzel* pp. 3466-67 *infra*.

if the interactive computer service does not "creat[e] or develop[ ]" the information "in whole or in part." *See* 47 U.S.C. § 230(f)(3).

Our dissenting colleague takes a much narrower view of what it means to "develop" information online, and concludes that Roommate does not develop the information because "[a]ll Roommate does is to provide a form with options for standardized answers." Dissent at 3487. But Roommate does much more than provide options. To begin with, it asks discriminatory questions that even the dissent grudgingly admits are not entitled to CDA immunity. Dissent at 3480 n.5. The FHA makes it unlawful to ask certain discriminatory questions for a very good reason: Unlawful questions solicit (a.k.a. "develop") unlawful answers. Not only does Roommate ask these questions, Roommate makes answering the discriminatory questions a condition of doing business. This is no different from a real estate broker in real life saying, "Tell me whether you're Jewish or you can find yourself another broker." When a business enterprise extracts such information from potential customers as a condition of accepting them as clients, it is no stretch to say that the enterprise is responsible, at least in part, for developing that information. For the dissent to claim that the information in such circumstances is "created solely by" the customer, and that the business has not helped in the least to develop it, Dissent at 3487-88, strains both credulity and English.[19]

---

[19]The dissent may be laboring under a misapprehension as to how the Roommate website is alleged to operate. For example, the dissent spends some time explaining that certain portions of the user profile application are voluntary. Dissent at 3485-87. We do not discuss these because plaintiffs do not base their claims on the voluntary portions of the application, except the "Additional Comments" portion, discussed below, *see* pp. 3471-75 *infra*. The dissent also soft-pedals Roommate's influence on the mandatory portions of the applications by referring to it with such words as "encourage" or "encouragement" or "solicitation." Dissent at 3493; *see id.* at 3499. Roommate, of course, does much more than encourage or solicit; it forces users to answer certain questions and thereby provide information that other clients can use to discriminate unlawfully.

Roommate also argues that it is not responsible for the information on the profile page because it is each subscriber's action that leads to publication of his particular profile—in other words, the user pushes the last button or takes the last act before publication. We are not convinced that this is even true,[20] but don't see why it matters anyway. The projectionist in the theater may push the last button before a film is displayed on the screen, but surely this doesn't make him the sole producer of the movie. By any reasonable use of the English language, Roommate is "responsible" at least "in part" for each subscriber's profile page, because every such page is a collaborative effort between Roommate and the subscriber.

[9] Similarly, Roommate is not entitled to CDA immunity for the operation of its search system, which filters listings, or of its email notification system, which directs emails to subscribers according to discriminatory criteria.[21] Roommate designed its search system so it would steer users based on the preferences and personal characteristics that Roommate itself forces subscribers to disclose. If Roommate has no immunity for asking the discriminatory questions, as we concluded above, *see* pp. 3455-57 *supra*, it can certainly have no immunity for using the answers to the unlawful questions to limit who has access to housing.

For example, a subscriber who self-identifies as a "Gay male" will not receive email notifications of new housing

---

[20]When a prospective subscriber submits his application, Roommate's server presumably checks it to ensure that all required fields are complete, and that any credit card information is not fraudulent or erroneous. Moreover, some algorithm developed by Roommate then decodes the input, transforms it into a profile page and notifies other subscribers of a new applicant or individual offering housing matching their preferences.

[21]Other circuits have held that it is unlawful for housing intermediaries to "screen" prospective housing applicants on the basis of race, even if the preferences arise with landlords. *See Jeanty* v. *McKey & Poague, Inc.*, 496 F.2d 1119, 1120-21 (7th Cir. 1974).

opportunities supplied by owners who limit the universe of acceptable tenants to "Straight male(s)," "Straight female(s)" and "Lesbian(s)." Similarly, subscribers with children will not be notified of new listings where the owner specifies "no children." Councils charge that limiting the information a subscriber can access based on that subscriber's protected status violates the Fair Housing Act and state housing discrimination laws. It is, Councils allege, no different from a real estate broker saying to a client: "Sorry, sir, but I can't show you any listings on this block because you are [gay/female/black/a parent]." If such screening is prohibited when practiced in person or by telephone, we see no reason why Congress would have wanted to make it lawful to profit from it online.

Roommate's search function is similarly designed to steer users based on discriminatory criteria. Roommate's search engine thus differs materially from generic search engines such as Google, Yahoo! and MSN Live Search, in that Roommate designed its system to use allegedly unlawful criteria so as to limit the results of each search, and to force users to participate in its discriminatory process. In other words, Councils allege that Roommate's search is designed to make it more difficult or impossible for individuals with certain protected characteristics to find housing—something the law prohibits. By contrast, ordinary search engines do not use unlawful criteria to limit the scope of searches conducted on them, nor are they designed to achieve illegal ends—as Roommate's search function is alleged to do here. Therefore, such search engines play no part in the "development" of any unlawful searches. *See* 47 U.S.C. § 230(f)(3).

**[10]** It's true that the broadest sense of the term "develop" could include the functions of an ordinary search engine— indeed, just about any function performed by a website. But to read the term so broadly would defeat the purposes of section 230 by swallowing up every bit of the immunity that the section otherwise provides. At the same time, reading the exception for co-developers as applying only to content that

originates entirely with the website—as the dissent would seem to suggest—ignores the words "development . . . in part" in the statutory passage "creation *or development* in whole *or in part*." 47 U.S.C. § 230(f)(3) (emphasis added). We believe that both the immunity for passive conduits and the exception for co-developers must be given their proper scope and, to that end, we interpret the term "development" as referring not merely to augmenting the content generally, but to materially contributing to its alleged unlawfulness. In other words, a website helps to develop unlawful content, and thus falls within the exception to section 230, if it contributes materially to the alleged illegality of the conduct.

The dissent accuses us of "rac[ing] past the plain language of the statute," dissent at 3493, but we clearly do pay close attention to the statutory language, particularly the word "develop," which we spend many pages exploring. The dissent may disagree with our definition of the term, which is entirely fair, but surely our dissenting colleague is mistaken in suggesting we ignore the term. Nor is the statutory language quite as plain as the dissent would have it. Dissent at 3491-93. Quoting selectively from the dictionary, the dissent comes up with an exceedingly narrow definition of this rather complex and multi faceted term.[22] Dissent at 3491 (defining development as "gradual advance or growth through progressive changes") (quoting *Webster's Third New International Dictionary* 618 (2002)). The dissent does not pause to consider how such a definition could apply to website content at all, as it excludes the kinds of swift and disorderly changes that are the hallmark of growth on the Internet. Had our dissenting colleague looked just a few lines lower on the same page of the

---

[22]Development, it will be recalled, has many meanings, which differ materially depending on context. Thus, "development" when used as part of the phrase "research and development" means something quite different than when referring to "mental development," and something else again when referring to "real estate development," "musical development" or "economic development."

same edition of the same dictionary, she would have found another definition of "development" that is far more suitable to the context in which we operate: "making usable or available." *Id.* The dissent does not explain why the definition it has chosen reflects the statute's "plain meaning," while the ones it bypasses do not.

More fundamentally, the dissent does nothing at all to grapple with the difficult statutory problem posed by the fact that section 230(c) uses both "create" and "develop" as separate bases for loss of immunity. Everything that the dissent includes within its cramped definition of "development" fits just as easily within the definition of "creation"—which renders the term "development" superfluous. The dissent makes no attempt to explain or offer examples as to how its interpretation of the statute leaves room for "development" as a separate basis for a website to lose its immunity, yet we are advised by the Supreme Court that we must give meaning to all statutory terms, avoiding redundancy or duplication wherever possible. *See Park 'N Fly, Inc.* v. *Dollar Park & Fly, Inc.*, 469 U.S. 189, 197 (1985).

While content to pluck the "plain meaning" of the statute from a dictionary definition that predates the Internet by decades, *compare Webster's Third New International Dictionary* 618 (1963) *with Webster's Third New International Dictionary* 618 (2002) (both containing "gradual advance or growth through progressive changes"), the dissent overlooks the far more relevant definition of "[web] content development" in Wikipedia: "the process of researching, writing, gathering, organizing and editing information for publication on web sites." Wikipedia, Content Development (Web), http://en.wikipedia.org/w/index.php?title=Content_development_%28web%29&oldid=188219503 (last visited Mar. 19, 2008). Our interpretation of "development" is entirely in line with the context-appropriate meaning of the term, and easily fits the activities Roommate engages in.

In an abundance of caution, and to avoid the kind of misunderstanding the dissent seems to encourage, we offer a few examples to elucidate what does and does not amount to "development" under section 230 of the Communications Decency Act: If an individual uses an ordinary search engine to query for a "white roommate," the search engine has not contributed to any alleged unlawfulness in the individual's conduct; providing *neutral* tools to carry out what may be unlawful or illicit searches does not amount to "development" for purposes of the immunity exception. A dating website that requires users to enter their sex, race, religion and marital status through drop-down menus, and that provides means for users to search along the same lines, retains its CDA immunity insofar as it does not contribute to any alleged illegality;[23] this immunity is retained even if the website is sued for libel based on these characteristics because the website would not have contributed materially to any alleged defamation. Similarly, a housing website that allows users to specify whether they will or will not receive emails by means of *user-defined* criteria might help some users exclude email from other users of a particular race or sex. However, that website would be immune, so long as it does not require the use of discriminatory criteria. A website operator who edits user-created content—such as by correcting spelling, removing obscenity or trimming for length—retains his immunity for any illegality in the user-created content, provided that the edits are unrelated to the illegality. However, a website operator who edits in a manner that contributes to the alleged illegality— such as by removing the word "not" from a user's message reading "[Name] did *not* steal the artwork" in order to transform an innocent message into a libelous one—is directly involved in the alleged illegality and thus not immune.[24]

---

[23]It is perfectly legal to discriminate along those lines in dating, and thus there can be no claim based solely on the content of these questions.

[24]Requiring website owners to refrain from taking affirmative acts that are unlawful does not strike us as an undue burden. These are, after all, businesses that are being held responsible only for their own conduct;

[11] Here, Roommate's connection to the discriminatory filtering process is direct and palpable: Roommate designed its search and email systems to limit the listings available to subscribers based on sex, sexual orientation and presence of children.[25] Roommate selected the criteria used to hide listings, and Councils allege that the act of hiding certain listings is itself unlawful under the Fair Housing Act, which prohibits brokers from steering clients in accordance with discriminatory preferences.[26] We need not decide the merits of Councils' claim to hold that Roommate is sufficiently involved with the design and operation of the search and email systems—which are engineered to limit access to housing on the basis of the protected characteristics elicited by the registration process—so as to forfeit any immunity to which it was otherwise entitled under section 230.

---

there is no vicarious liability for the misconduct of their customers. Compliance with laws of general applicability seems like an entirely justified burden for all businesses, whether they operate online or through quaint brick-and-mortar facilities. Insofar, however, as a plaintiff would bring a claim under state or federal law based on a website operator's passive acquiescence in the misconduct of its users, the website operator would likely be entitled to CDA immunity. This is true even if the users committed their misconduct using electronic tools of general applicability provided by the website operator.

[25]Of course, the logic of Roommate's argument is not limited to discrimination based on these particular criteria. If Roommate were free to discriminate in providing housing services based on sex, there is no reason another website could not discriminate based on race, religion or national origin. Nor is its logic limited to housing; it would apply equally to websites providing employment or educational opportunities—or anything else, for that matter.

[26]The dissent argues that Roommate is not liable because the decision to discriminate on these grounds does not originate with Roommate; instead, "users have chosen to select characteristics that they find desirable." Dissent at 3493. But, it is Roommate that *forces* users to express a preference and Roommate that forces users to disclose the information that can form the basis of discrimination by others. Thus, Roommate makes discrimination both possible and respectable.

Roommate's situation stands in stark contrast to *Stratton Oakmont*, the case Congress sought to reverse through passage of section 230. There, defendant Prodigy was held liable for a user's unsolicited message because it attempted to *remove* some problematic content from its website, but didn't remove enough. Here, Roommate is not being sued for removing some harmful messages while failing to remove others; instead, it is being sued for the predictable consequences of creating a website designed to solicit and enforce housing preferences that are alleged to be illegal.

We take this opportunity to clarify two of our previous rulings regarding the scope of section 230 immunity. Today's holding sheds additional light on *Batzel* v. *Smith*, 333 F.3d 1018 (9th Cir. 2003). There, the editor of an email newsletter received a tip about some artwork, which the tipster falsely alleged to be stolen. The newsletter editor incorporated the tipster's email into the next issue of his newsletter and added a short headnote, which he then emailed to his subscribers.[27] The art owner sued for libel and a split panel held the newsletter editor to be immune under section 230 of the CDA.[28]

Our opinion is entirely consistent with that part of *Batzel* which holds that an editor's minor changes to the spelling, grammar and length of third-party content do not strip him of section 230 immunity. None of those changes contributed to the libelousness of the message, so they do not add up to "development" as we interpret the term. *See* pp. 3461-64 *supra*. *Batzel* went on to hold that the editor *could* be liable for

---

[27]Apparently, it was common practice for this editor to receive and forward tips from his subscribers. In effect, the newsletter served as a heavily moderated discussion list.

[28]As an initial matter, the *Batzel* panel held that the defendant newsletter editor was a "user" of an interactive computer service within the definition provided by section 230. While we have our doubts, we express no view on this issue because it is not presented to us. *See* p. 3452 n.7 *supra*. Thus, we assume that the editor fell within the scope of section 230's coverage without endorsing *Batzel*'s analysis on this point.

selecting the tipster's email for inclusion in the newsletter, depending on whether or not the tipster had tendered the piece to the editor for posting online, and remanded for a determination of that issue. *Batzel*, 333 F.3d at 1035.

**[12]** The distinction drawn by *Batzel* anticipated the approach we take today. As *Batzel* explained, if the tipster tendered the material for posting online, then the editor's job was, essentially, to determine whether or not to prevent its posting—precisely the kind of activity for which section 230 was meant to provide immunity.[29] And any activity that can be boiled down to deciding whether to exclude material that third parties seek to post online is perforce immune under section 230. *See* p. 3468-69 & n.32 *infra*. But if the editor publishes material that he does not believe was tendered to him for posting online, then he is the one making the affirmative decision to publish, and so he contributes materially to its allegedly unlawful dissemination. He is thus properly deemed a developer and not entitled to CDA immunity. *See Batzel*, 333 F.3d at 1033.[30]

---

[29]As *Batzel* pointed out, there can be no meaningful difference between an editor starting with a default rule of publishing all submissions and then manually selecting material to be removed from publication, and a default rule of publishing no submissions and manually selecting material to be published—they are flip sides of precisely the same coin. *Batzel*, 333 F.3d at 1032 ("The scope of [section 230] immunity cannot turn on whether the publisher approaches the selection process as one of inclusion or removal, as the difference is one of method or degree, not substance.").

[30]The dissent scores a debater's point by noting that the same activity might amount to "development" or not, depending on whether it contributes materially to the illegality of the content. Dissent at 3489. But we are not defining "development" for all purposes; we are defining the term only for purposes of determining whether the defendant is entitled to immunity for a particular act. This definition does not depend on finding substantive liability, but merely requires analyzing the context in which a claim is brought. A finding that a defendant is not immune is quite distinct from finding liability: On remand, Roommate may still assert other defenses to liability under the Fair Housing Act, or argue that its actions do not violate the Fair Housing Act at all. Our holding is limited to a determination that the CDA provides no immunity to Roommate's actions in soliciting and developing the content of its website; whether that content is in fact illegal is a question we leave to the district court.

We must also clarify the reasoning undergirding our holding in *Carafano* v. *Metrosplash.com, Inc.*, 339 F.3d 1119 (9th Cir. 2003), as we used language there that was unduly broad. In *Carafano*, an unknown prankster impersonating actress Christianne Carafano created a profile for her on an online dating site. The profile included Carafano's home address and suggested that she was looking for an unconventional liaison. When Carafano received threatening phone calls, she sued the dating site for publishing the unauthorized profile. The site asserted immunity under section 230. We correctly held that the website was immune, but incorrectly suggested that it could never be liable because "no [dating] profile has any content until a user actively creates it." *Id.* at 1124. As we explain above, *see* pp. 3458-64 *supra*, even if the data are supplied by third parties, a website operator may still contribute to the content's illegality and thus be liable as a developer.[31] Providing immunity every time a website uses data initially obtained from third parties would eviscerate the exception to section 230 for "develop[ing]" unlawful content "in whole or in part." 47 U.S.C. § 230(f)(3).

We believe a more plausible rationale for the unquestionably correct result in *Carafano* is this: The allegedly libelous content there—the false implication that Carafano was unchaste—was created and developed entirely by the malevolent user, without prompting or help from the website operator. To be sure, the website provided neutral tools, which the anonymous dastard used to publish the libel, but the website did absolutely nothing to encourage the posting of defamatory content—indeed, the defamatory posting was contrary to the website's express policies. The claim against the website was, in effect, that it failed to review each user-created profile to ensure that it wasn't defamatory. That is precisely the kind of activity for which Congress intended to grant absolution with

---

[31]We disavow any suggestion that *Carafano* holds an information content provider *automatically* immune so long as the content originated with another information content provider. 339 F.3d at 1125.

the passage of section 230. With respect to the defamatory content, the website operator was merely a passive conduit and thus could not be held liable for failing to detect and remove it.[32]

By contrast, Roommate both elicits the allegedly illegal content and makes aggressive use of it in conducting its business. Roommate does not merely provide a framework that could be utilized for proper or improper purposes; rather, Roommate's work in developing the discriminatory questions, discriminatory answers and discriminatory search mechanism is directly related to the alleged illegality of the site. Unlike *Carafano*, where the website operator had nothing to do with the user's decision to enter a celebrity's name and personal information in an otherwise licit dating service, here, Roommate is directly involved with developing and enforcing a system that subjects subscribers to allegedly discriminatory housing practices.

Our ruling today also dovetails with another facet of *Carafano*: The mere fact that an interactive computer service "classifies user characteristics . . . does not transform [it] into a 'developer' of the 'underlying misinformation.' " *Carafano*, 339 F.3d at 1124. *Carafano*, like *Batzel*, correctly anticipated our common-sense interpretation of the term "develop[ ]" in section 230. Of course, any classification of information, like the sorting of dating profiles by the type of relationship sought in *Carafano*, could be construed as "develop[ment]" under an unduly broad reading of the term. But, once again, such a broad reading would sap section 230 of all meaning.

The salient fact in *Carafano* was that the website's classifi-

---

[32]Section 230 requires us to scrutinize particularly closely any claim that can be boiled down to the failure of an interactive computer service to edit or block user-generated content that it believes was tendered for posting online, *see* pp. 3466-67 *supra*, as that is the very activity Congress sought to immunize by passing the section. *See* pp. 3453-55 *supra*.

cations of user characteristics did absolutely nothing to enhance the defamatory sting of the message, to encourage defamation or to make defamation easier: The site provided neutral tools specifically designed to match romantic partners depending on their voluntary inputs. By sharp contrast, Roommate's website is designed to force subscribers to divulge protected characteristics and discriminatory preferences, and to match those who have rooms with those who are looking for rooms based on criteria that appear to be prohibited by the FHA.[33]

---

[33]The dissent coyly suggests that our opinion "sets us apart from" other circuits, Dissent at 3479, 3483-84, carefully avoiding the phrase "inter-circuit conflict." And with good reason: No other circuit has considered a case like ours and none has a case that even arguably conflicts with our holding today. No case cited by the dissent involves active participation by the defendant in the creation or development of the allegedly unlawful content; in each, the interactive computer service provider passively relayed content generated by third parties, just as in *Stratton Oakmont*, and did not design its system around the dissemination of unlawful content.

In *Chicago Lawyers' Committee for Civil Rights Under Law, Inc.* v. *craigslist, Inc.*, No. 07-1101 (7th Cir. Mar. 14, 2008), the Seventh Circuit held the online classified website craigslist immune from liability for discriminatory housing advertisements submitted by users. Craigslist's service works very much like the "Additional Comments" section of Roommate's website, in that users are given an open text prompt in which to enter any description of the rental property without any structure imposed on their content or any requirement to enter discriminatory information: Nothing in the service craigslist offers induces anyone to post any particular listing or express a preference for discrimination . . . ." Slip op. at 9. We similarly hold the "Additional Comments" section of Roommate's site immune, *see* pp. 3471-75 *infra*. Consistent with our opinion, the Seventh Circuit explained the limited scope of section 230(c) immunity. *Craigslist*, slip op. at 5-7. More directly, the Seventh Circuit noted in dicta that "causing a *particular* statement to be made, or perhaps [causing] the *discriminatory content of a statement*" might be sufficient to create liability for a website. Slip op. at 9 (emphasis added). Despite the dissent's attempt to imply the contrary, the Seventh Circuit's opinion is actually in line with our own.

In *Universal Communications Systems* v. *Lycos, Inc.*, the First Circuit held a message board owner immune under the CDA for defamatory comments posted on a message board. 478 F.3d 413 (1st Cir. 2007). The alleg-

**3.** Councils finally argue that Roommate should be held liable for the discriminatory statements displayed in the "Additional Comments" section of profile pages. At the end of the registration process, on a separate page from the other registration steps, Roommate prompts subscribers to "tak[e] a moment to personalize your profile by writing a paragraph or two describing yourself and what you are looking for in a roommate." The subscriber is presented with a blank text box, in which he can type as much or as little about himself as he wishes. Such essays are visible only to paying subscribers.

Subscribers provide a variety of provocative, and often

edly defamatory comments were made without any prompting or encouragement by defendant: "[T]here is not even a colorable argument that any misinformation was prompted by Lycos's registration process or its link structure." *Id.* at 420.

*Green* v. *America Online*, 318 F.3d 465 (3d Cir. 2003), falls yet farther from the mark. There, AOL was held immune for derogatory comments and malicious software transmitted by other defendants through AOL's "Romance over 30" "chat room." There was no allegation that AOL solicited the content, encouraged users to post harmful content or otherwise had any involvement whatsoever with the harmful content, other than through providing "chat rooms" for general use.

In *Ben Ezra, Weinstein, and Co.* v. *America Online Inc.*, 206 F.3d 980 (10th Cir. 2000), the Tenth Circuit held AOL immune for relaying inaccurate stock price information it received from other vendors. While AOL undoubtedly participated in the decision to make stock quotations available to members, it did not cause the errors in the stock data, nor did it encourage or solicit others to provide inaccurate data. AOL was immune because "Plaintiff could not identify any evidence indicating Defendant [AOL] developed or created the stock quotation information." *Id.* at 985 n.5.

And, finally, in *Zeran* v. *America Online, Inc.*, 129 F.3d 327 (4th Cir. 1997), the Fourth Circuit held AOL immune for yet another set of defamatory and harassing message board postings. Again, AOL did not solicit the harassing content, did not encourage others to post it, and had nothing to do with its creation other than through AOL's role as the provider of a generic message board for general discussions.

very revealing, answers. The contents range from subscribers who "[p]ref[er] white Male roommates" or require that "[t]he person applying for the room MUST be a BLACK GAY MALE" to those who are "NOT looking for black muslims." Some common themes are a desire to live without "drugs, kids or animals" or "smokers, kids or druggies," while a few subscribers express more particular preferences, such as preferring to live in a home free of "psychos or anyone on mental medication." Some subscribers are just looking for someone who will get along with their significant other[34] or with their most significant Other.[35]

[13] Roommate publishes these comments as written.[36] It does not provide any specific guidance as to what the essay should contain, nor does it urge subscribers to input discriminatory preferences. Roommate is not responsible, in whole or in part, for the development of this content, which comes entirely from subscribers and is passively displayed by Roommate. Without reviewing every essay, Roommate would have no way to distinguish unlawful discriminatory preferences from perfectly legitimate statements. Nor can there be any doubt that this information was tendered to Roommate for publication online. *See* pp. 3466-67 *supra*. This is precisely the kind of situation for which section 230 was designed to provide immunity. *See* pp. 3453-3455 *supra*.

[14] The fact that Roommate encourages subscribers to provide *something* in response to the prompt is not enough to make it a "develop[er]" of the information under the common-sense interpretation of the term we adopt today. It is

---

[34]"The female we are looking for hopefully wont [sic] mind having a little sexual incounter [sic] with my boyfriend and I [very sic]."

[35]"We are 3 Christian females who Love our Lord Jesus Christ . . . . We have weekly bible studies and bi-weekly times of fellowship."

[36]It is unclear whether Roommate performs any filtering for obscenity or "spam," but even if it were to perform this kind of minor editing and selection, the outcome would not change. *See Batzel*, 333 F.3d at 1031.

entirely consistent with Roommate's business model to have subscribers disclose as much about themselves and their preferences as they are willing to provide. But Roommate does not tell subscribers what kind of information they should or must include as "Additional Comments," and certainly does not encourage or enhance any discriminatory content created by users. Its simple, generic prompt does not make it a developer of the information posted.[37]

Councils argue that—given the context of the discriminatory questions presented earlier in the registration process— the "Additional Comments" prompt impliedly suggests that subscribers should make statements expressing a desire to discriminate on the basis of protected classifications; in other words, Councils allege that, by encouraging *some* discriminatory preferences, Roommate encourages other discriminatory preferences when it gives subscribers a chance to describe themselves. But the encouragement that bleeds over from one part of the registration process to another is extremely weak, if it exists at all. Such weak encouragement cannot strip a website of its section 230 immunity, lest that immunity be rendered meaningless as a practical matter.[38]

We must keep firmly in mind that this is an immunity statute we are expounding, a provision enacted to protect websites against the evil of liability for failure to remove

---

[37]Nor would Roommate be the developer of discriminatory content if it provided a free-text search that enabled users to find keywords in the "Additional Comments" of others, even if users utilized it to search for discriminatory keywords. Providing neutral tools for navigating websites is fully protected by CDA immunity, absent substantial affirmative conduct on the part of the website creator promoting the use of such tools for unlawful purposes.

[38]It's true that, under a pedantic interpretation of the term "develop," any action by the website—including the mere act of making a text box available to write in—could be seen as "develop[ing]" content. However, we have already rejected such a broad reading of the term "develop" because it would defeat the purpose of section 230. *See* pp. 3461-64 *supra*.

offensive content. *See* pp. 3453-3455 *supra*. Websites are complicated enterprises, and there will always be close cases where a clever lawyer could argue that *something* the website operator did encouraged the illegality. Such close cases, we believe, must be resolved in favor of immunity, lest we cut the heart out of section 230 by forcing websites to face death by ten thousand duck-bites, fighting off claims that they promoted or encouraged—or at least tacitly assented to—the illegality of third parties. Where it is very clear that the website directly participates in developing the alleged illegality—as it is clear here with respect to Roommate's questions, answers and the resulting profile pages—immunity will be lost. But in cases of enhancement by implication or development by inference—such as with respect to the "Additional Comments" here—section 230 must be interpreted to protect websites not merely from ultimate liability, but from having to fight costly and protracted legal battles.

[15] The dissent prophesies doom and gloom for countless Internet services, Dissent at 3490-91, but fails to recognize that we hold part of Roommate's service entirely immune from liability. The search engines the dissent worries about, *id.*, closely resemble the "Additional Comments" section of Roommate's website. Both involve a generic text prompt with no direct encouragement to perform illegal searches or to publish illegal content. We hold Roommate immune and there is no reason to believe that future courts will have any difficulty applying this principle.[39] The message to website operators is

---

[39]The dissent also accuses us of creating uncertainty that will chill the continued growth of commerce on the Internet. Dissent at 3496. Even looking beyond the fact that the Internet has outgrown its swaddling clothes and no longer needs to be so gently coddled, *see* p. 3456 n.15 *supra*, some degree of uncertainty is inevitable at the edge of any rule of law. Any immunity provision, including section 230, has its limits and there will always be close cases. Our opinion extensively clarifies where that edge lies, and gives far more guidance than our previous cases. While the dissent disagrees about the scope of the immunity, there can be little doubt that website operators today know more about how to conform their conduct to the law than they did yesterday.

clear: If you don't encourage illegal content, or design your website to require users to input illegal content, you will be immune.

We believe that this distinction is consistent with the intent of Congress to preserve the free-flowing nature of Internet speech and commerce without unduly prejudicing the enforcement of other important state and federal laws. When Congress passed section 230 it didn't intend to prevent the enforcement of all laws online; rather, it sought to encourage interactive computer services that provide users *neutral* tools to post content online to police that content without fear that through their "good samaritan . . . screening of offensive material," 47 U.S.C. § 230(c), they would become liable for every single message posted by third parties on their website.

\* \* \*

[16] In light of our determination that the CDA does not provide immunity to Roommate for all of the content of its website and email newsletters, we remand for the district court to determine in the first instance whether the alleged actions for which Roommate is not immune violate the Fair Housing Act, 42 U.S.C. § 3604(c).[40] We vacate the dismissal

However, a larger point remains about the scope of immunity provisions. It's no surprise that defendants want to extend immunity as broadly as possible. We have long dealt with immunity in different, and arguably far more important, contexts—such as qualified immunity for police officers in the line of duty, *see Clement* v. *J&E Service Inc.*, No. 05-56692, slip op. at 2347 (9th Cir. Mar. 11, 2008)—and observed many defendants argue that the risk of getting a close case wrong is a justification for broader immunity. Accepting such an argument would inevitably lead to an endless broadening of immunity, as every new holding creates its own borderline cases.

[40]We do not address Roommate's claim that its activities are protected by the First Amendment. The district court based its decision entirely on the CDA and we refrain from deciding an issue that the district court has not had the opportunity to evaluate. *See Mukherjee* v. *INS*, 793 F.2d 1006, 1010 (9th Cir. 1986).

of the state law claims so that the district court may reconsider whether to exercise its supplemental jurisdiction in light of our ruling on the federal claims. *Fredenburg* v. *Contra Costa County Dep't of Health Servs.*, 172 F.3d 1176, 1183 (9th Cir. 1999). We deny Roommate's cross-appeal of the denial of attorneys' fees and costs; Councils prevail on some of their arguments before us so their case is perforce not frivolous.

**REVERSED in part, VACATED in part, AFFIRMED in part and REMANDED. NO COSTS.**

---

McKEOWN, Circuit Judge, with whom RYMER and BEA, Circuit Judges, join, concurring in part and dissenting in part:

The ubiquity of the Internet is undisputed. With more than 1.3 billion Internet users and over 158 million websites in existence,[1] a vast number of them interactive like Google, Yahoo!, Craigslist, MySpace, YouTube, and Facebook, the question of webhost liability is a significant one. On a daily basis, we rely on the tools of cyberspace to help us make, maintain, and rekindle friendships; find places to live, work, eat, and travel; exchange views on topics ranging from terrorism to patriotism; and enlighten ourselves on subjects from "aardvarks to Zoroastrianism."[2]

The majority's unprecedented expansion of liability for Internet service providers threatens to chill the robust development of the Internet that Congress envisioned. The majority condemns Roommate's "search system," a function that is the

---

[1]Internet World Stats, World Internet Users: December 2007, http://www.internetworldstats.com/stats.htm (last visited Mar. 14, 2008); Netcraft, February 2008 Web Server Survey, http://news.netcraft.com/archives/web_server_survey.html (last visited Mar. 14, 2008).

[2]*Ashcroft v. ACLU*, 535 U.S. 564, 566 (2002).

heart of interactive service providers. My concern is not an empty Chicken Little "sky is falling" alert. By exposing every interactive service provider to liability for sorting, searching, and utilizing the all too familiar drop-down menus, the majority has dramatically altered the landscape of Internet liability. Instead of the "robust"[3] immunity envisioned by Congress, interactive service providers are left scratching their heads and wondering where immunity ends and liability begins.

To promote the unfettered development of the Internet, Congress adopted the Communications Decency Act of 1996 ("CDA"), which provides that interactive computer service providers will not be held legally responsible for publishing information provided by third parties. 47 U.S.C. § 230(c)(1). Even though traditional publishers retain liability for performing essentially equivalent acts in the "non-virtual world," Congress chose to treat interactive service providers differently by immunizing them from liability stemming from sorting, searching, and publishing third-party information. As we explained in *Batzel v. Smith:*

> [Section] 230(c)(1)[ ] overrides the traditional treatment of publishers, distributors, and speakers under statutory and common law. As a matter of policy, "Congress decided not to treat providers of interactive computer services like other information providers such as newspapers, magazines or television and radio stations . . . ." Congress . . . has chosen to treat cyberspace differently.

333 F.3d 1018, 1026-1027 (9th Cir. 2003) (quoting *Blumenthal v. Drudge*, 992 F. Supp. 44, 49 (D.D.C. 1998) (footnote omitted)).

---

[3]*Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119, 1123 (9th Cir. 2003).

Now, with the stroke of a pen or, more accurately, a few strokes of the keyboard, the majority upends the settled view that interactive service providers enjoy broad immunity when publishing information provided by third parties. Instead, interactive service providers are now joined at the hip with third-party users, and they rise and fall together in liability for Internet sortings and postings.

To be sure, the statute, which was adopted just as the Internet was beginning a surge of popular currency,[4] is not a perfect match against today's technology. The Web 2.0 version is a far cry from web technology in the mid-1990s. Nonetheless, the basic message from Congress has retained its traction, and there should be a high bar to liability for organizing and searching third-party information. The bipartisan view in Congress was that the Internet, as a new form of communication, should not be impeded by the transference of regulations and principles developed from traditional modes of communication. The majority repeatedly harps that if something is prohibited in the physical world, Congress could not have intended it to be legal in cyberspace. Yet that is precisely the path Congress took with the CDA: the anomaly that a webhost may be immunized for conducting activities in cyberspace that would traditionally be cause for liability is exactly what Congress intended by enacting the CDA.

In the end, the majority offers interactive computer service providers no bright lines and little comfort in finding a home within § 230(c)(1). The result in this case is driven by the distaste for housing discrimination, a laudable endgame were housing the real focus of this appeal. But it is not. I share the majority's view that housing discrimination is a troubling issue. Nevertheless, we should be looking at the housing issue

---

[4]According to one commentator, in 1985, there were approximately 1,000 host computers connected to the Internet; by 1995, that number had exploded to 4,000,000. Paul H. Arne, *New Wine in Old Bottles: The Developing Law of the Internet*, 416 PLI/Pat 9, 15 (Sept. 1995).

through the lens of the Internet, not from the perspective of traditional publisher liability. Whether § 230(c)(1) trumps the Fair Housing Act ("FHA") is a policy decision for Congress, not us. Congress has spoken: third-party content on the Internet should not be burdened with the traditional legal framework.

I respectfully part company with the majority as to Part 2[5] of the opinion because the majority has misconstrued the statutory protection under the CDA for Roommate's publishing and sorting of user profiles. The plain language and structure of the CDA unambiguously demonstrate that Congress intended these activities—the collection, organizing, analyzing, searching, and transmitting of third-party content—to be beyond the scope of traditional publisher liability. The majority's decision, which sets us apart from five circuits, contravenes congressional intent and violates the spirit and serendipity of the Internet.

Specifically, the majority's analysis is flawed for three reasons: (1) the opinion conflates the questions of liability under the FHA and immunity under the CDA; (2) the majority rewrites the statute with its definition of "information content provider," labels the search function "information development," and strips interactive service providers of immunity; and (3) the majority's approach undermines the purpose of § 230(c)(1) and has far-reaching practical consequences in the Internet world.

---

[5]The complaint centers on the responses and profiles generated by the users. To the extent that the inquiry in isolation is part of the claims, then I agree with Part 1 of the majority's opinion that § 230(c)(1) would not protect Roommate. However, I cannot join the majority insofar as it eviscerates the distinction between traditional publishers and webhosts. *See, e.g.*, Maj. Op. at 3456 (ignoring the Congressional carveout for interactive service providers and concluding that if a face-to-face transaction were illegal, it could not be legal in cyberspace).

To begin, it is important to recognize what this appeal is not about. At this stage, there has been no determination of liability under the FHA, nor has there been any determination that the questions, answers or even the existence of Roommate's website violate the FHA. The FHA is a complicated statute and there may well be room for potential roommates to select who they want to live with, e.g., a tidy accountant wanting a tidy professional roommate, a collegiate male requesting a male roommate, an observant Jew needing a house with a kosher kitchen, or a devout, single, religious female preferring not to have a male housemate. It also bears noting that even if Roommate is immune under the CDA, the issue of user liability for allegedly discriminatory preferences is a separate question. *See Zeran v. Am. Online, Inc.*, 129 F.3d 327, 330 (4th Cir. 1997) (stating that "the original culpable party" does not "escape accountability").

By offering up inflammatory examples, the majority's opinion screams "discrimination." The hazard is, of course, that the question of discrimination has not yet been litigated. In dissenting, I do not condone housing discrimination or endorse unlawful discriminatory roommate selection practices; I simply underscore that the merits of the FHA claim are not before us. However, one would not divine this posture from the majority's opinion, which is infused with condemnation of Roommate's users' practices. To mix and match, as does the majority, the alleged unlawfulness of the information with the question of webhost immunity is to rewrite the statute.

Examples from the opinion highlight that the majority's conclusion rests on the premise that Roommate's questions and matching function violate the FHA:

- "Unlawful questions solicit (a.k.a. 'develop') unlawful answers." Maj. Op. at 3459.

- "If such questions are unlawful when posed face-to-face or by telephone, they don't magically

become lawful when asked electronically online." *Id.* at 3456.

- "If such screening is prohibited when practiced in person or by telephone, we see no reason why Congress would have wanted to make it lawful to profit from it online." *Id.* at 3461.

- "Roommate's search function thus differs materially from generic search engines such as Google, Yahoo! and MSN Live Search, in that Roommate designed its system to use allegedly unlawful criteria so as to limit the results of each search, and to force users to participate in its discriminatory process." *Id.*

- "By contrast, ordinary search engines do not use unlawful criteria to limit the scope of searches conducted on them, nor are they designed to achieve illegal ends—as Roommate's search function is alleged to do here." *Id.*

- "Roommate's website is designed to force subscribers to divulge protected characteristics and discriminatory preferences." *Id.* at 3470.

The entire opinion links Roommate's ostensibly reprehensible conduct (and that of its users) with an unprecedented interpretation of the CDA's immunity provision. The majority condemns Roommate for soliciting illegal content, but there has been no determination that Roommate's questions or standardized answers are illegal. Instead of foreshadowing a ruling on the FHA, the opinion should be confined to the issue before us—application of § 230(c)(1) to Roommate. The district court has not yet ruled on the merits of the FHA claim and neither should we.

**The Statute**

With this background in mind, I first turn to the text of the statute. Section 230 begins with a detailed recitation of findings and policy reasons for the statute. Congress expressly found that the "Internet and other interactive computer services offer a forum for a true diversity of political discourse, unique opportunities for cultural development, and myriad avenues for intellectual activity," and that "[i]ncreasingly Americans are relying on interactive media for a variety of political, educational, cultural, and entertainment services." 47 U.S.C. § 230(a)(3), (5). Congress declared that "[i]t is the policy of the United States to . . . promote the continued development of the Internet and other interactive computer services and other interactive media." § 230(b)(1).[6]

Unlike some statutes, subsections (a) and (b) set out in clear terms the congressional findings and policies underlying the statute. For this reason, it strikes me as odd that the majority begins, not with the statute and these express findings, but with legislative history. Granted, Congress was prompted by several cases, particularly the *Prodigy* case, to take action to protect interactive service providers. *See Stratton Oakmont, Inc. v. Prodigy Servs. Co.*, 1995 N.Y. Misc. LEXIS 229 (N.Y. Sup. Ct. May 24, 1995). But that case does not cabin the scope of the statute, and the background leading up to enactment of the CDA is no substitute for the language of the statute itself. *See Chicago Lawyers' Comm. for Civil Rights Under the Law, Inc. v. Craigslist, Inc.*, No. 07-1101, slip op. at 8 (7th Cir. Mar. 14, 2008) (concluding that, as enacted, "Section 230(c)(1) is general[,]" despite its "genesis" in *Prodigy*).

---

[6]The statute also seeks to "remove disincentives for the development and utilization of blocking and filtering technologies" and "to ensure vigorous enforcement of Federal criminal laws to deter and punish trafficking in obscenity, stalking, and harassment by means of computer." § 230(b)(4), (5).

Section 230(c), the heart of this case, is entitled "Protection for 'good samaritan' blocking and screening of offensive material[.]" The substantive language of the statute itself is not so limited. Section 230(c)(1) provides:

> (1)    Treatment of publisher or speaker
>
> No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider.

§ 230(c)(1). Since it was first addressed in 1997 in *Zeran*, this section has been interpreted by the courts as providing web-host "immunity," although to be more precise, it provides a safe haven for interactive computer service providers by removing them from the traditional liabilities attached to speakers and publishers.[7] *See Zeran*, 129 F.3d at 330 ("By its plain language, § 230 creates a federal immunity to any cause of action that would make service providers liable for information originating with a third-party user of the service.").

We have characterized this immunity under § 230(c)(1) as "quite robust." *Carafano*, 339 F.3d at 1123. Five of our sister circuits have similarly embraced this robust view of immunity by providing differential treatment to interactive service providers. *Chicago Lawyers' Comm. for Civil Rights Under the Law, Inc. v. Craigslist, Inc.*, No. 07-1101, slip op. at 7-8 (7th Cir. Mar. 14, 2008); *Universal Commc'n Sys. v. Lycos, Inc.*, 478 F.3d 413, 415 (1st Cir. 2007); *Green v. Am. Online*, 318 F.3d 465, 470 (3d Cir. 2003); *Ben Ezra, Weinstein, & Co., Inc. v. Am. Online Inc.*, 206 F.3d 980, 986 (10th Cir. 2000);

---

[7]The second part of this subsection, § 230(c)(2), is more accurately characterized as an immunity provision, but is not relevant to our discussion here. *Compare* 47 U.S.C. § 230(c)(2) (stating that "[n]o provider or user of an interactive computer service *shall be held liable . . .*") (emphasis added).

*Zeran*, 129 F.3d at 330; *see also Whitney Info. Network, Inc. v. Xcentric Ventures, LLC*, No. 2:04-cv-47-FtM-34SPC, 2008 U.S. Dist. LEXIS 11632 (M.D. Fla. Feb. 15, 2008); *Doe v. MySpace, Inc.*, 474 F. Supp. 2d 843, 849 (W.D. Tex. 2007); *Corbis Corp. v. Amazon.com, Inc.*, 351 F. Supp. 2d 1090, 1118 (W.D. Wash. 2004); *Blumenthal*, 992 F. Supp. at 50-53; *Barrett v. Rosenthal*, 146 P.3d 510, 529 (Cal. 2006); *Gentry v. eBay, Inc.*, 121 Cal. Rptr. 2d 703, 717-18 (Cal. Ct. App. 2002); *Schneider v. Amazon.com, Inc.*, 31 P.3d 37, 42-43 (Wash. Ct. App. 2001).

Key to this immunity provision are the terms "interactive computer service" provider and "information content provider." The CDA defines an "interactive computer service" as any "information service, system, or access software provider that provides or enables computer access by multiple users to a computer server." § 230(f)(2). An interactive computer service provider is not liable as a "publisher" or "speaker" of information if the "information" is "provided by another information content provider." § 230(c)(1). The statute then defines an "information content provider" as a "person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service." § 230(f)(3). If the provider of an interactive computer service is an information content provider of the information at issue, it cannot claim immunity as a publisher or speaker. *Carafano*, 339 F.3d at 1123.

Courts deciding the question of § 230(c)(1) immunity "do not write on a blank slate." *Universal Commc'n*, 478 F.3d at 418. Even though rapid developments in technology have made webhosts increasingly adept at searching and displaying third-party information, reviewing courts have, in the twelve years since the CDA's enactment, "adopt[ed] a relatively expansive definition of 'interactive computer service' and a relatively restrictive definition of 'information content provider.' " *See Carafano*, 339 F.3d at 1123 (footnotes omitted). As

long as information is provided by a third party, webhosts are immune from liability for publishing "ads for housing, auctions of paintings that may have been stolen by Nazis, biting comments about steroids in baseball, efforts to verify the truth of politicians' promises, and everything else that third parties may post on a web site." *Craigslist*, No. 07-1101, slip op. at 9. We have underscored that this broad grant of webhost immunity gives effect to Congress's stated goals "to promote the continued development of the Internet and other interactive computer services" and "to preserve the vibrant and competitive free market that presently exists for the Internet and other interactive computer services." *Carafano*, 339 F.3d at 1123 (discussing § 230(b)(1), (2)).

### Application of § 230(c)(1) to Roommate's Website

Because our focus is on the term "information content provider," and what it means to create or develop information, it is worth detailing exactly how the website operates, what information is at issue and who provides it. The roommate matching process involves three categories of data: About Me or Household Description; Roommate Preferences; and Comments.

To become a member of Roommates.com, a user must complete a personal profile by selecting answers from drop-down menus or checking off boxes on the screen. The profile includes "location" information (e.g., city and state, region of the city, and data about the surrounding neighborhood); details about the residence (e.g., the total number of bedrooms and bathrooms in the home, and amenities such as air conditioning, wheelchair access, high-speed Internet, or parking), and the "rental details" (e.g., monthly rent charged, lease period, and availability). The last section of the profile is the "Household Description" section,[8] which includes the total

---

[8]A user who is a room-seeker fills out an equivalent section named "About Me."

number of occupants in the home, their age range, gender, occupation, level of cleanliness, whether they are smokers, and whether children or pets are present.

The remaining sections of the registration process are completely optional; a user who skips them has created a profile based on the information already provided. At his option, the user may select an emoticon to describe the "household character," and may upload images of the room or residence. Next, users may, at their option, specify characteristics desired in a potential roommate, such as a preferred age range, gender, and level of cleanliness. If nothing is selected, all options are included.[9] The final step in the registration pro-

---

[9]The following is an example of a member profile:

**The Basics**
Rent:    $800 per month + $800 deposit
Lease:    6 month
Date available:    09/01/04 (14 days)
Utilities included:    N/A
Features:    Private bedroom, Private bathroom

**Residence & Vicinity**
Building:    House, 2 bed, 1.5 bath
Features:    N/A
Location:    (Central) Long Beach, CA

**Household**
Occupant:    1, Age 26, Male (straight)
Occupation:    Student
Smoking habits:    Outside smoker
Cleanliness:    About average
Children:    Children will not be living with us
Pets:    Dog(s)

**Preferences**
Age group:    18-99
Gender:    Male (straight or gay), Female (straight or lesbian)
Smoking:    Smoking okay
Cleanliness level:    Clean, Average, Messy
Pets:    Dog okay, Cat okay, Caged pet okay
Children:    Children okay

**Comments**
LOOKING FOR CHILL ROOMATE [sic] TO SHARE 2 BR HOUSE WITH DOG AND FERRET - RENT 800/MO+utill.6mo.lease.

cess, which is also optional, is the "Comments" section, in which users are presented with a blank text box in which they may write whatever they like, to be published with their member profiles.

Users may choose an optional "custom search" of user profiles based on criteria that they specify, like the amount of monthly rent or distance from a preferred city. Based on the information provided by users during the registration process, Roommate's automated system then searches and matches potential roommates. Roommate's Terms of Service provide in part, "You understand that we do not provide the information on the site and that all publicly posted or privately transmitted information, data, text, photographs, graphics, messages, or other materials ('Content') are the sole responsibility of the person from which such Content originated."

Roommate's users are "information content providers" because they are responsible for creating the information in their user profiles and, at their option — not the website's choice — in expressing preferences as to roommate characteristics. § 230(f)(3). The critical question is whether Roommate is itself an "information content provider," such that it cannot claim that the information at issue was "provided by another information content provider." A close reading of the statute leads to the conclusion that Roommate is not an information content provider for two reasons: (1) providing a drop-down menu does not constitute "creating" or "developing" information; and (2) the structure and text of the statute make plain that Congress intended to immunize Roommate's sorting, displaying, and transmitting of third-party information.

Roommate neither "creates" nor "develops" the information that is challenged by the Councils, i.e., the information provided by the users as to their protected characteristics and the preferences expressed as to roommate characteristics. All Roommate does is to provide a form with options for standardized answers. Listing categories such as geographic loca-

tion, cleanliness, gender and number of occupants, and transmitting to users profiles of other users whose expressed information matches their expressed preferences, can hardly be said to be creating or developing information. Even adding standardized options does not "develop" information. Roommate, with its prompts, is merely "selecting material for publication," which we have stated does not constitute the "development" of information. *Batzel*, 333 F.3d at 1031. The profile is created solely by the user, not the provider of the interactive website. Indeed, without user participation, there is no information at all. The drop-down menu is simply a pre-categorization of user information before the electronic sorting and displaying that takes place via an algorithm. If a user has identified herself as a non-smoker and another has expressed a preference for a non-smoking roommate, Roommate's sorting and matching of user information are no different than that performed by a generic search engine.

Displaying the prompt "Gender" and offering the list of choices, "Straight male; Gay male; Straight female; Gay female" does not develop the information, "I am a Gay male." The user has identified himself as such and provided that information to Roommate to publish. Thus, the user is the sole creator of that information; no "development" has occurred. In the same vein, presenting the user with a "Preferences" section and drop-down menus of options does not "develop" a user's preference for a non-smoking roommate. As we stated in *Carafano*, the "actual profile 'information' consist[s] of the particular options chosen" by the user, such that Roommate is not "responsible, even in part, for associating certain multiple choice responses with a set of [ ] characteristics." 339 F.3d at 1124.

The thrust of the majority's proclamation that Roommate is "developing" the information that it publishes, sorts, and transmits is as follows: "[W]e interpret the term 'development' as referring not merely to augmenting the content generally, but to materially contributing to its unlawfulness."

Maj. Op. at 3462. This definition is original to say the least and springs forth untethered to anything in the statute.

The majority's definition of "development" epitomizes its consistent collapse of substantive liability with the issue of immunity. Where in the statute does Congress say anything about unlawfulness? Whether Roommate is entitled to immunity for publishing and sorting profiles is wholly distinct from whether Roommate may be liable for violations of the FHA. Immunity has meaning only when there is something to be immune *from*, whether a disease or the violation of a law. It would be nonsense to claim to be immune only from the innocuous. But the majority's immunity analysis is built on substantive liability: to the majority, CDA immunity depends on whether a webhost materially contributed to the unlawfulness of the information. Whether the information at issue is unlawful and whether the webhost has contributed to its unlawfulness are issues analytically independent of the determination of immunity. Grasping at straws to distinguish Roommate from other interactive websites such as Google and Yahoo!, the majority repeatedly gestures to Roommate's potential substantive liability as sufficient reason to disturb its immunity. But our task is to determine whether the question of substantive liability may be reached in the first place.

Keep in mind that "unlawfulness" would include not only purported statutory violations but also potential defamatory statements. The irony is that the majority would have us determine "guilt" or liability in order to decide whether immunity is available. This upside-down approach would knock out even the narrowest immunity offered under § 230(c) — immunity for defamation as a publisher or speaker.

Another flaw in the majority's approach is that it fails to account for all of the other information allegedly developed by the webhost. For purposes of determining whether Roommate is an information content provider vis-a-vis the profiles,

the inquiry about geography and the inquiry about gender should stand on the same footing. Both are single word prompts followed by a drop-down menu of options. If a prompt about gender constitutes development, then so too does the prompt about geography. And therein lies the rub.

Millions of websites use prompts and drop-down menus. Inquiries range from what credit card you want to use and consumer satisfaction surveys asking about age, sex and household income, to dating sites, e.g., match.com, sites lambasting corporate practices, e.g., ripoffreports.com, and sites that allow truckers to link up with available loads, e.g., getloaded.com. Some of these sites are innocuous while others may not be. Some may solicit illegal information; others may not. But that is not the point. The majority's definition of "development" would transform every interactive site into an information content provider and the result would render illusory any immunity under § 230(c). Virtually every site could be responsible in part for developing content.

For example, the majority purports to carve out a place for Google and other search engines. Maj. Op. at 3461. But the modern Google is more than a match engine: it ranks search results, provides prompts beyond what the user enters, and answers questions. In contrast, Roommate is a straight match service that searches information and criteria provided by the user, not Roommate. It should be afforded no less protection than Google, Yahoo!, or other search engines.

The majority then argues that "providing *neutral* tools to carry out what may be unlawful or illicit searches does not amount to 'development.' " Maj. Op. at 3464. But this effort to distinguish Google, Yahoo!, and other search engines from Roommate is unavailing. Under the majority's definition of "development," these search engines are equivalent to Roommate. Google "encourages" or "contributes" (the majority's catch phrases) to the unlawfulness by offering search tools that allow the user to perform an allegedly unlawful match. If

a user types into Google's search box, "looking for a single, Christian, female roommate," and Google displays responsive listings, Google is surely "materially contributing to the alleged unlawfulness" of information created by third parties, by publishing their intention to discriminate on the basis of protected characteristics. In the defamation arena, a webhost's publication of a defamatory statement "materially contributes" to its unlawfulness, as publication to third parties is an element of the offense. At bottom, the majority's definition of "development" can be tucked in, let out, or hemmed up to fit almost any search engine, creating tremendous uncertainty in an area where Congress expected predictability.

"Development" is not without meaning. In *Batzel*, we hinted that the "development of information" that transforms one into an "information content provider" is "something more substantial than merely editing portions of an email and selecting material for publication." 333 F.3d at 1031. We did not flesh out further the meaning of "development" because the editor's alterations of an email message and decision to publish it did not constitute "development." *Id.*

Because the statute does not define "development," we should give the term its ordinary meaning. *See San Jose Christian Coll. v. City of Morgan Hill*, 360 F.3d 1024, 1034 (9th Cir. 2004) (stating that dictionaries may be used to determine the " 'plain meaning' of a term undefined by a statute"). "Development" is defined in Webster's Dictionary as a "gradual advance or growth through progressive changes." *Webster's Third New International Dictionary* 618 (2002). The multiple uses of "development" and "develop" in other provisions of § 230 give texture to the definition of "development," and further expose the folly of the majority's ungrounded definition. *See, e.g.*, § 230(b)(3) (stating that "[i]t is the policy of the United States to encourage the *development* of technologies which maximize user control over what information is received by individuals, families, and schools") (emphasis

added).[10] Defining "development" in this way keeps intact the settled rule that the CDA immunizes a webhost who exercises a publisher's "traditional editorial functions — such as deciding whether to publish, withdraw, post-pone, or alter content." *Batzel*, 333 F.3d at 1031 n.18.[11]

Applying the plain meaning of "development" to Roommate's sorting and transmitting of third-party information demonstrates that it was not transformed into an "information content provider." In searching, sorting, and transmitting information, Roommate made no changes to the information

---

[10]Congress also stated in the CDA that "[i]t is the policy of the United States to—(1) to promote the continued *development* of the Internet and other interactive computer services and other interactive media," and "(4) to remove disincentives for the *development* and utilization of blocking and filtering technologies . . ." § 230(b)(1), (4) (emphasis added).

[11]The majority's notion of using a different definition of "development" digs the majority into a deeper hole. *See* Maj. Op. at 3461-63. For example, adopting the Wikipedia definition of "content development"—"the process of researching, writing, gathering, organizing and editing information for publication on web sites"—would run us smack into the sphere of Congressionally conferred immunity. Wikipedia, Content Development (Web), http://en.wikipedia.org/w/index.php?title=Content_development_%28web%29&oldid=188219503 (last visited Mar. 24, 2008). Both our circuit and others have steadfastly maintained that activities such as organizing or editing information are traditional editorial functions that fall within the scope of CDA immunity. *See, e.g.*, *Carafano*, 339 F.3d at 1124-25; *Zeran*, 129 F.3d at 330. Likewise, an alternative definition of "development" from Webster's such as "a making usable or available" sweeps too broadly, as "making usable or available" is precisely what Google and Craigslist do. In an effort to cabin the reach of the opinion, the majority again goes back to whether the content is legal, i.e., a dating website that requires sex, race, religion, or marital status is legal because it is legal to discriminate in dating. *See* Maj. Op. at 3464. Of course this approach ignores whether the claim may be one in tort, such as defamation, rather than a statutory discrimination claim. And, this circularity also circumvents the plain language of the statute. Interestingly, the majority has no problem offering up potentially suitable definitions of "development" by turning to dictionaries, but it fails to explain why, and from where, it plucked its definition of "development" as "materially contributing to [the] alleged unlawfulness" of content. *See* Maj. Op. at 3462.

provided to it by users. Even having notice that users may be using its site to make discriminatory statements is not sufficient to invade Roommate's immunity. *See Zeran*, 129 F.3d at 333 (stating that "liability upon notice has a chilling effect on the freedom of Internet speech.").

The majority blusters that Roommate develops information, because it "requir[es] subscribers to provide the information as a condition of accessing its services," and "designed its search system so it would steer users based on the preferences and personal characteristics that Roommate itself forces subscribers to disclose." Maj. Op. at 3458, 3460.[12] But the majority, without looking back, races past the plain language of the statute. That Roommate requires users to answer a set of prompts to identify characteristics about themselves does not change the fact that the users have furnished this information to Roommate for Roommate to publish in their profiles. Nor do Roommate's prompts alter the fact that users have chosen to select characteristics that they find desirable in potential roommates, and have directed Roommate to search and compile results responsive to their requests. Moreover, tagging Roommate with liability for the design of its search system is dangerous precedent for analyzing future Internet cases.

Even if Roommate's prompts and drop-down menus could be construed to seek out, or encourage, information from users, the CDA does not withhold immunity for the encouragement or solicitation of information.[13] *See Blumenthal*, 992 F. Supp. at 52 (stating that "Congress has made a different

---

[12]Again, Roommate does not force users to disclose preferences as to roommate characteristics.

[13]The First Circuit has noted that "[i]t is not at all clear that there is a culpable assistance exception to Section 230 immunity[,]" similar to the notion of secondary liability under the Electronic Communications Privacy Act of 1986. *Universal Commc'n*, 478 F.3d at 421. But it also stated that it "need not decide whether a claim premised on active inducement might be consistent with Section 230 in the absence of a specific exception." *Id.*

policy choice by providing immunity even where the interactive service provider has an *active, even aggressive role* in making available content prepared by others.") (emphasis added); *Gentry*, 121 Cal. Rptr. 2d at 718 (noting that "enforcing appellants' negligence claim would place liability on eBay for simply compiling false and/or misleading content created by the individual defendants and other coconspirators."). The CDA does not countenance an exception for the solicitation or encouragement of information provided by users.

A number of district courts have recently encountered the claim that an interactive website's solicitation of information, by requiring user selection of content from drop-down menus, transformed it into an information content provider. Unsurprisingly, these courts reached the same commonsense solution that I reach here: § 230(c)(1) immunizes the interactive service provider. *See Whitney Info. Network, Inc. v. Xcentric Ventures, LLC*, No. 2:04-cv-47-FtM-34SPC, 2008 U.S. Dist. LEXIS 11632, at *36 (M.D. Fla. Feb. 15, 2008) (stating that the "mere fact that Xcentric provides categories from which a poster must make a selection in order to submit a report on the [ ] website is not sufficient to treat Defendants as information content providers of the reports"); *Global Royalties, Ltd. v. Xcentric Ventures, LLC*, No. 07-956-PHX-FJM, 2007 U.S. Dist. LEXIS 77551 (D. Ariz. Oct. 10, 2007). Simply supplying a list of options from which a user must select options "is minor and passive participation" that does not defeat CDA immunity. *Global Royalties*, 2007 U.S. Dist. LEXIS 77551, at *9; *see also Corbis*, 351 F. Supp. 2d at 1118 (holding that even though Amazon.com "may have encouraged third parties to use the Zshops platform and provided the tools to assist them, that does not disqualify it from immunity under § 230 because the Zshops vendor ultimately decided what information to put on its site.").

*Carafano* presented circumstances virtually indistinguishable from those before us, yet the majority comes to the exact opposite conclusion here in denying immunity for sorting and

matching third-party information provided in response to webhost prompts. The website in *Carafano*, an online dating service named Matchmaker.com, asked its users sixty-two detailed questions and matched users according to their responses. We held that § 230(c)(1) immunized the dating service, and flatly rejected the proposition that matching, sorting, and publishing user information in response to webhost prompts abrogated CDA immunity. *Carafano*, 339 F.3d at 1124-25. A provider's "decision to structure the information provided by users," which enables the provider to "offer additional features, such as 'matching' profiles with similar characteristics or highly structured searches based on combinations of multiple choice questions," ultimately "promotes the expressed Congressional policy 'to promote the continued development of the Internet and other interactive computer services.' " *Id.* (quoting § 230(b)(1)). Now the majority narrows *Carafano* on the basis that Matchmaker did not prompt the allegedly libelous information that was provided by a third party. Maj. Op. at 3468. But the majority makes this distinction without *any* language in the statute supporting the consideration of the webhost's prompting or solicitation.

The structure of the statute also supports my view that Congress intended to immunize Roommate's sorting and publishing of user profiles. An "interactive computer service" is defined to include an "access software provider." § 230(f)(2). The statute defines an "access software provider" as one that provides "enabling tools" to "filter," "screen," "pick," "choose," "analyze," "digest," "search," "forward," "organize," and "reorganize" content. § 230(f)(4)(A)-(C).

By providing a definition for "access software provider" that is distinct from the definition of an "information content provider," and withholding immunity for "information content providers," the statute makes resoundingly clear that packaging, sorting, or publishing third-party information are not the kind of activities that Congress associated with "infor-

mation content providers." Yet these activities describe exactly what Roommate does through the publication and distribution of user profiles: Roommate "receives," "filters," "digests," and "analyzes" the information provided by users in response to its registration prompts, and then "transmits," "organizes," and "forwards" that information to users in the form of uniformly organized profiles. Roommate is performing tasks that Congress recognized as typical of entities that it intended to immunize.

Finally, consider the logical disconnect of the majority's opinion. The majority writes—and I agree—that the open-ended Comments section contains only third-party content. Maj. Op. at 3471-75. But if Roommate's search function permits sorting by key words such as children or gender, the majority would label Roommate's use of such criteria as a "discriminatory filtering process." *Id.* at 3465.

At a minimum, the CDA protects the search criteria employed by websites and does not equate tools that "filter," "screen," "pick," "choose," "analyze," "digest," "search," "forward," "organize," and "reorganize" with the "creation or development" of information. § 230(f)(4)(A)-(C).

### Ramifications of the Majority Opinion

I am troubled by the consequences that the majority's conclusion poses for the ever-expanding Internet community. The unwise narrowing of our precedent, coupled with the mixing and matching of CDA immunity with substantive liability, make it exceedingly difficult for website providers to know whether their activities will be considered immune under the CDA. We got it right in *Carafano*, that "[u]nder § 230(c) . . . so long as a third party willingly provides the essential published content, the interactive service provider receives full immunity regardless of the specific editing or selection process." 339 F.3d at 1124 (quoted in *Doe*, 474 F. Supp. 2d at 847; *Chicago Lawyers' Comm. for Civil Rights Under the*

*Law, Inc. v. Craigslist, Inc.*, 461 F. Supp. 2d 681, 690 n.7 (N.D. Ill. 2006); *Dimeo v. Max*, 433 F. Supp. 2d 523, 530 n.12 (E.D. Pa. 2006); *Prickett v. Infousa, Inc.*, No. 04:05-CV-10, 2006 U.S. Dist. LEXIS 21867, at *4 (E.D. Tex. Mar. 30, 2006)).

Significantly, § 230(e) expressly exempts from its scope certain areas of law, such as intellectual property law and federal criminal laws. § 230(e)(1) ("Nothing in this section shall be construed to impair the enforcement of [selected obscenity statutes] or any other Federal criminal statute."); § 230(e)(2) ("Nothing in this section shall be construed to limit or expand any law pertaining to intellectual property."). *See also Perfect 10, Inc. v. CCBILL LLC*, 488 F.3d 1102, 1118 (9th Cir. 2007). Thus, for example, a webhost may still be liable as a publisher or speaker of third-party information that is alleged to infringe a copyright. Notably, the CDA does not exempt the FHA and a host of other federal statutes from its scope. *See* § 230(e). The FHA existed at the time of the CDA's enactment, yet Congress did not add it to the list of specifically enumerated laws for which publisher and speaker liability was left intact. The absence of a statutory exemption suggests that Congress did not intend to provide special case status to the FHA in connection with immunity under the CDA. *See TRW Inc. v. Andrews*, 534 U.S. 19, 28 (2001) (stating that "[w]here Congress explicitly enumerates certain exceptions to a general prohibition, additional exceptions are not to be implied, in the absence of evidence of a contrary legislative intent.") (citation omitted); *see also Craigslist*, No. 07-1101, slip op. at 8 (stating that "[t]he question is not whether Congress gave any thought to the Fair Housing Act, but whether it excluded § 3604(c) from the reach of § 230(c)(1)").

Anticipating the morphing of the Internet and the limits of creative genius and entrepreneurship that fuel its development is virtually impossible. However, Congress explicitly drafted the law to permit this unfettered development of the Internet.

Had Congress discovered that, over time, courts across the country have created more expansive immunity than it originally envisioned under the CDA, Congress could have amended the law. But it has not. In fact, just six years ago, Congress approved of the broad immunity that courts have uniformly accorded interactive webhosts under § 230(c).

In 2002, Congress passed the "Dot Kids Implementation and Efficiency Act," which established a new "kids.us" domain for material that is safe for children. Pub. L. No. 107-317, 116 Stat. 2766. Congress stated that the statutory protections of § 230(c) were extended to certain entities that operated within the new domain. 47 U.S.C. § 941 (stating that certain entities "are deemed to be interactive computer services for purposes of § 230(c)"). The Committee Report that accompanied the statute declared:

> The Committee notes that ISPs have successfully defended many lawsuits using section 230(c). *The courts have correctly interpreted section 230(c)*, which was aimed at protecting against liability for such claims as negligence (See, e.g., Doe v. America Online, 783 So.2d 1010 (Fla. 2001)) and defamation (Ben Ezra, Weinstein, and Co. v. America Online, 206 F.3d 980 (2000); Zeran v. America Online, 129 F.3d 327 (1997)). The Committee intends these interpretations of section 230(c) to be equally applicable to those entities covered by H.R. 3833.

H.R. REP. No. 107-449 (emphasis added). These statements "reflect the Committee's intent that the existing statutory construction," i.e., broad immunity for interactive webhosts, "be maintained in a new legislative context." *Barrett*, 146 P.3d at 523 n.17 (discussing H.R. Rep. No. 107-449); *see also Heckler v. Turner*, 470 U.S. 184, 209 (1985) (noting that subsequent legislative history can shed useful light on Congressional intent). This express Congressional approval of the courts' interpretation of § 230(c)(1), six years after its

enactment, advises us to stay the course of "robust" webhost immunity.

The consequences of the majority's interpretation are far-reaching. Its position will chill speech on the Internet and impede "the continued development of the Internet and other interactive computer services and other interactive media." § 230(b)(1). To the extent the majority strips immunity because of sorting, channeling, and categorizing functions, it guts the heart of § 230(c)(1) immunity. Countless websites operate just like Roommate: they organize information provided by their users into a standardized format, and provide structured searches to help users find information. These sites, and their attendant display, search, and inquiry tools, are an indispensable part of the Internet tool box. Putting a lid on the sorting and searching functions of interactive websites stifles the core of their services.

To the extent the majority strips immunity because the information or query may be illegal under some statute or federal law, this circumstance puts the webhost in the role of a policeman for the laws of the fifty states and the federal system. There are not enough Net Nannies in cyberspace to implement this restriction, and the burden of filtering content would be unfathomable.

To the extent the majority strips immunity because a site solicits or actively encourages content, the result is a direct restriction on the free exchange of ideas and information on the Internet. As noted in the amici curiae brief of the news organizations, online news organization routinely solicit third-party information. Were the websites to face host liability for this content, they "would have no choice but to severely limit its use" and "[s]heer economics would dictate that vast quantities of valuable information be eliminated from websites." Brief of Amici Curiae News Organizations in Support of Roommate.com, LLC 22.

To the extent the majority strips immunity because a website "materially contributed" to the content or output of a website by "specialization" of content, this approach would essentially swallow the immunity provision. The combination of solicitation, sorting, and potential for liability would put virtually every interactive website in this category. Having a website directed to Christians, Muslims, gays, disabled veterans, or childless couples could land the website provider in hot water.[14]

Because the statute itself is cumbersome to interpret in light of today's Internet architecture, and because the decision today will ripple through the billions of web pages already online, and the countless pages to come in the future, I would take a cautious, careful, and precise approach to the restriction of immunity, not the broad swath cut by the majority. I respectfully dissent and would affirm the district court's judgment that Roommate is entitled to immunity under § 230(c)(1) of the CDA, subject to examination of whether the bare inquiry itself is unlawful.

---

[14]It is no surprise that there are countless specialized roommate sites. *See, e.g.*, http://islam.tc/housing/index.php, *http://christian-roommates.com*, *and http://prideroommates.com.*