Filed 9/21/22

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| SAMANTHA LIAPES et al., <br>     Plaintiffs and Appellants, <br> v. <br> FACEBOOK, INC., <br>     Defendant and Respondent. | A164880 <br><br> (San Mateo County Super. Ct. No. 20CIV01712) |

Samantha Liapes filed a class action against Facebook, Inc. (Facebook, now known as Meta Platforms, Inc.), alleging it does not provide women and older people equal access to insurance ads on its online platform in violation of the Unruh Civil Rights Act and Civil Code section 51.5 — both of which prohibit businesses from discriminating against people with protected characteristics, such as gender and age. (Civ. Code, §§ 51, 51.5, 52, subd. (a), undesignated statutory references are to this code.)[1] Liapes alleged Facebook requires all advertisers to choose the age and gender of its users who will receive ads, and companies offering insurance products routinely tell it to not send their ads to women or older people. She further alleged Facebook's ad-delivery algorithm, the system that determines which users will receive ads,

---

[1] Some courts have used "the Unruh Act" to refer collectively to sections 51 and 52. (E.g., *Munson v. Del Taco, Inc.* (2009) 46 Cal.4th 661, 667–668.) Section 51, however, indicates that statute "shall be known, and may be cited, as the Unruh Civil Rights Act." (*Id.*, subd. (a).) We use Unruh Civil Rights Act accordingly.

1

discriminates against women and older people by relying heavily on the two key data points of age and gender. As a result, Liapes alleged, women and older people were excluded from receiving insurance ads.

The trial court sustained Facebook's demurrer, deciding Liapes did not plead sufficient facts to support her discrimination claims. It concluded Facebook's tools are neutral on their face and simply have a disproportionate impact on a protected class, rather than intentionally discriminating. The court further concluded Facebook was immune under section 230 of the Communications Decency Act of 1996 (47 U.S.C. § 230 (section 230)), which applies to interactive computer service providers acting as a "publisher or speaker" of content provided by others. Liapes appealed. We review de novo the ruling on the demurrer. (*Regents of University of California v. Superior Court* (2013) 220 Cal.App.4th 549, 558 (*Regents*).) Liberally construing the complaint and drawing all reasonable inferences in favor of Liapes's claims, we conclude the complaint alleges facts sufficient to state a cause of action and reverse. (*Ibid.*)

## BACKGROUND[2]

Facebook is a popular social networking service with over two billion users every month. As a condition to joining, users must provide it with their birth dates and gender. Users cannot opt out of disclosing this information. Users engage with Facebook in various ways, including through its " 'News Feed,' " " 'Stories,' " " 'Marketplace,' " and " 'Watch.' " Companies use it to send ads, such as for insurance products and services, to consumers. They pay Facebook to place their ads on users' News Feeds.

Facebook provides advertisers with several tools to determine who receives ads. One is "Audience Selection," allowing advertisers "to specify the

---

[2] All facts are taken from Liapes's complaint.

parameters of the target audience of Facebook users who will be eligible to receive the advertisement." There are thousands of categories advertisers *may* select or exclude, such as interests and behaviors, when setting the audience. But advertisers are *required* to make three selections establishing basic target audience parameters: age, gender, and location. Each of these three categories has a drop-down menu indicating advertisers can include or exclude users by age or gender. The default setting is 18 to 65 years and older and all genders, meaning all users 18 years old or older would receive the ad.

Facebook, however, counsels against the broad default audience parameters. In "Facebook Blueprint," a training program for advertisers, Facebook strongly encourages them to narrow the age range and genders of users who will receive ads to make them more effective. It suggests, for example, " 'Let's start with gender. If you want, you can choose to reach out to only men or only women. If you have a bridal dress shop, women might be a better audience for you. But if you have a shaving and beard grooming business, maybe you'll want to reach out to men.' " Other tips include considering one's customer base: " '[t]hink about what [your customers] like, how old they are and the interests they have. This can help you identify audience options that will help you reach people like them on Facebook.' " Thus, if " 'the majority of your current customers are women, it might be a good idea to set your audience to reach women and exclude men.' "

Once the audience is selected, the advertiser determines the ad content and the Facebook page or other web page on which the ad will link. The advertiser purchases impressions — an event that occurs every time a user is shown an ad on Facebook — or clicks — an event that occurs every time a user clicks on an ad. Facebook then sends the ad to users within the

3

Audience Selection parameters. Users who are not within the selected audience will not receive the ad.

Facebook also allows advertisers to target their ads through a "Lookalike Audiences" tool. Advertisers provide Facebook with a list of users "whom they believe are the type of customers they want to reach." Facebook then applies its own analysis and algorithm to identify a larger audience resembling the sample audience. The resulting audience will be eligible to receive the ad. Facebook expressly uses age and gender to directly determine which users will be included in a Lookalike Audience. Thus, if an advertiser creates a sample audience that is disproportionately male or younger, the Lookalike Audience will disproportionately exclude women and older people.

Once the audience has been selected, Facebook thereafter uses an ad-delivery algorithm to further determine which users within a particular audience will receive ads. "For example, if an advertiser chooses an audience selection of 500,000 but purchases only 50,000 impressions to be sent to Facebook users within that audience selection, Facebook must determine which of the 500,000 Facebook users will actually receive the advertisement." The algorithm uses a variety of data points, such as data about each user and past and ongoing performance of certain types of ads to determine which users will receive the ad. In doing so, the algorithm relies heavily on age and gender to determine which users will actually receive the ad, *regardless of whether the advertiser directs Facebook to limit its Audience Selection based on those factors.*

One research study of Facebook's ad platform " 'observe[d] significant skew in delivery along gender . . . despite neutral targeting parameters.' " This bias, the researchers concluded, was the result of the platform — not the advertisers — making choices about which users to show the ads. Another

4

study auditing over 100,000 ads published on Facebook determined credit ads were more likely to be sent to a larger share of men than women.

Liapes is a 48-year-old woman and regular Facebook user. She was interested in learning about insurance products via ads on her News Feed because she did not have life insurance at that time. But she could not view several life insurance ads posted on Facebook due to her age or gender; had she been able to view the ads, she would have qualified for the insurance, applied for a quote, and possibly obtain a policy. For example, a life insurance ad by Ladder was only sent to people age 25 to 45. She did not see a Health IQ Special Rate Insurance ad since it was only sent to males ages 30 to 64. Similarly, she did not see a National Family Assurance ad because it was only sent to males ages 30 to 49. In addition, she did not see four ads for auto insurance or four ads for services comparing auto insurance rates in her News Feed. As a result, she had a harder time learning about those products or services.

In 2020, Liapes filed a class action alleging Facebook violated the Unruh Civil Rights Act by engaging in age and gender discrimination when providing users with ads regarding insurance opportunities.[3] She alleged she and class members were harmed by being segregated, classified, and treated in an unequal, stereotypical, and arbitrary manner, and being denied information they have a right to receive on an equal basis because of their

---

[3] This is Liapes's first amended complaint. Her original complaint alleged Facebook's Audience Selection tools and delivery algorithm routinely and systematically excluded older persons and women from viewing thousands of ads regarding financial services opportunities. Facebook demurred and moved to stay the case in favor of a separate federal case filed by Liapes's counsel asserting the same claims. After the federal case was dismissed, Liapes filed the amended complaint.

age and/or gender.[4]  In addition, Liapes alleged Facebook aided, abetted, and/or incited numerous insurance companies to publish the ads in a way that denied older persons and/or women full and equal accommodations, advantages, facilities, and services of their business establishments.  (§ 51, subd. (b).)  Based on the same allegations, Liapes further asserted Facebook violated section 51.5 by intentionally discriminating against, boycotting, and/or refusing to provide services to women and older people based on their age and gender.

The trial court sustained Facebook's demurrer.  It determined Liapes failed to allege Facebook engaged in intentional discrimination because the default setting for the Audience Selection tool and Lookalike Audience is age and gender neutral.  The court disregarded Liapes's allegations that the ad-delivery algorithm expressly discriminated on the basis of age and gender to increase the likelihood users would click on each ad and thus increase Facebook's revenue.  The court explained these allegations were inconsistent with those in the original complaint — that the purpose of the algorithm was "to optimize an advertisement's audience and the advertiser's goals by showing the advertisement preferentially to the users Facebook believes will maximize" views, engagement with the ad, and sales.  The court also rejected Liapes's aiding and abetting claim, concluding there were insufficient facts indicating Facebook knew the advertisers engaged in discrimination or substantially assisted them.  Finally, the court determined Liapes's claims were barred by section 230 because the Audience Selection and Lookalike

_____

[4] In 2018, Facebook entered into a settlement with the Washington State Attorney General, prohibiting Facebook from excluding users from receiving insurance ads based on race, creed, color, national origin, veteran or military status, sexual orientation, or disability.

Audience tools were neutral. Liapes appealed the order rather than amending her complaint.

## DISCUSSION

Liapes contends the trial court erroneously sustained Facebook's demurrer. When reviewing a ruling on a demurrer, we examine de novo whether the complaint alleges facts sufficient to state a cause of action. (*Regents*, *supra*, 220 Cal.App.4th at p. 558.) "We assume the truth of the properly pleaded factual allegations, [and] facts that reasonably can be inferred from those expressly pleaded." (*Ibid*.) But we do not assume the truth of "contentions, deductions, or conclusions of law." (*Stearn v. County of San Bernardino* (2009) 170 Cal.App.4th 434, 440.) We liberally construe the complaint "with a view to substantial justice between the parties," drawing "all reasonable inferences in favor of the asserted claims." (*Regents*, at p. 558; *Candelore v. Tinder, Inc*. (2018) 19 Cal.App.5th 1138, 1143 (*Candelore*).) The plaintiff must demonstrate the court erroneously sustained the demurrer and "must show the complaint alleges facts sufficient to establish every element of each cause of action." (*Rakestraw v. California Physicians' Service* (2000) 81 Cal.App.4th 39, 43.) Having engaged in that review, we agree the demurrer should not have been sustained.

### I.

The Unruh Civil Rights Act's purpose is "to secure to all persons equal access to public accommodations 'no matter' " the personal characteristics. (*Harris v. Capital Growth Investors XIV* (1991) 52 Cal.3d 1142, 1169.) It is intended to eradicate arbitrary, invidious discrimination in business establishments, and stand "as a bulwark protecting each person's inherent right to 'full and equal' access to 'all business establishments.' " (*Angelucci v. Century Supper Club* (2007) 41 Cal.4th 160, 167 (*Angelucci*).) Under the

7

statute, all persons "are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever." (§ 51, subd. (b).) The statute lists 14 types of prohibited discrimination, such as sex, race, and religion. (*Ibid*.) But the list is "illustrative, rather than restrictive" — the statute forbids discrimination beyond these enumerated categories. (*In re Cox* (1970) 3 Cal.3d 205, 212.) Thus, while not expressly identified, the Unruh Civil Rights Act prohibits arbitrary discrimination based on a person's age — "a personal characteristic similar to the classifications enumerated in the Act." (*Candelore*, *supra*, 19 Cal.App.5th at p. 1145.) Courts liberally construe the Unruh Civil Rights Act to achieve its remedial purpose of deterring discriminatory business practices. (*White v. Square, Inc.* (2019) 7 Cal.5th 1019, 1025 (*White*).)

Section 51.5 similarly provides "[n]o business establishment . . . shall discriminate against, boycott or blacklist, or refuse to buy from, contract with, sell to, or trade with any person in this state on account of any characteristic listed or defined in" the Unruh Civil Rights Act. (§ 51.5, subd. (a).)

A.

Facebook argues Liapes lacks standing to litigate her Unruh Civil Rights Act claim[5] because she was not injured by Facebook's ad-targeting methods that excluded women and older people from viewing insurance ads. Since challenges to standing are jurisdictional and may be raised at any time in the proceeding, including for the first time on appeal as here, Facebook has

---

[5] Because the analysis of the Unruh Civil Rights Act claim is the same as the section 51.5 analysis, we refer only to the Unruh Civil Rights Act for ease of reference. (*Semler v. General Electric Capital Corp.* (2011) 196 Cal.App.4th 1380, 1404.) But our conclusions apply equally to the Unruh Civil Rights Act and section 51.5 claims.

not forfeited this argument. (*Qualified Patients Assn. v. City of Anaheim* (2010) 187 Cal.App.4th 734, 751.) Its argument nonetheless fails.

"Standing under the Unruh Civil Rights Act is broad."[6] (*Osborne v. Yasmeh* (2016) 1 Cal.App.5th 1118, 1127.) When "any person or group of persons is engaged in conduct of resistance to the full enjoyment of any of the rights" under the Unruh Civil Rights Act, "any person aggrieved by the conduct may bring a civil action." (§ 52, subd. (c).) Plaintiffs, however, may not sue for discrimination in the abstract; they " 'must actually suffer the discriminatory conduct.' " (*Angelucci, supra*, 41 Cal.4th at p. 175.) Thus, only plaintiffs who have transacted with a defendant and have been subject to discrimination have standing under the Unruh Civil Rights Act. (*White, supra*, 7 Cal.5th at p. 1026.)

Liapes satisfied these requirements. (*Regents, supra*, 220 Cal.App.4th at p. 558.) As a Facebook user, she has transacted with it. (*White, supra*, 7 Cal.5th at p. 1026.) It knows her age and gender because all users must provide such information as a condition of joining Facebook. Liapes was interested in insurance ads available on Facebook. In particular, she was interested in obtaining life insurance because she did not have a policy at the time. Moreover, she was qualified to obtain the insurance. But Facebook, Liapes alleged, used its Audience Selection tool, Lookalike Audience feature,

---

[6] *Midpeninsula Citizens for Fair Housing v. Westwood Investors* (1990) 221 Cal.App.3d 1377 does not hold otherwise. There, the Court of Appeal determined a fair housing organization was not an aggrieved person under the Unruh Civil Rights Act merely because the defendants' allegedly discriminatory rental policy drained the organization's limited financial resources from its educational and counseling services and diverted them toward investigating discrimination claims made against the defendants — which might have been a basis for standing in federal court. (*Midpeninsula*, at pp. 1382, 1385.) Organizational standing based on diversion of resources is not at issue here.

and ad-delivery algorithm to exclude her from receiving certain insurance ads because of her gender and/or age.

The alleged injury is not conjectural or hypothetical. (*Osborne v. Yasmeh, supra,* 1 Cal.App.5th at p. 1127.) Liapes identified a life insurance ad that was only sent to males ages 30 to 49 because the advertiser used the Audience Selection tool. In another instance, a life insurance ad was not shown to her because it was only sent to people ages 25 to 45 — based on the advertiser's use of the Audience Selection tool — and because the advertiser wanted to reach people similar to its customers — based on the advertiser's use of the Lookalike Audience tool. Liapes further alleged, upon information and belief, that Facebook created thousands of Lookalike Audiences for insurance ads using age and gender to place users in the Lookalike Audiences. Because Liapes did not share characteristics with those Lookalike Audiences, she was less likely to receive the insurance ads or denied ads based on her gender and/or age. Moreover, she alleged the ad-delivery algorithm heavily weighted age and gender in advertising, thus skewing ads towards men rather than women. According to Liapes, it is important to immediately apply for and secure insurance offers because they often change or may expire. By excluding women and older people from ads, men and younger people obtained an advantage in the limited opportunities for securing insurance policies. Accepting her factual allegations as true, Liapes actually suffered discrimination — she was deprived of information regarding insurance opportunities despite being ready and able to pursue those opportunities. (*Angelucci, supra,* 41 Cal.4th at pp. 165, 175.)

Relying on general notions about effective advertising not appearing in the complaint, Facebook argues Liapes is not aggrieved because advertisers *may* have and often do run different versions of ads, such as different copy or

10

graphics, targeted to women and older people. Facebook further faults Liapes for failing to identify insurance ads she actually received, noting they may have been more valuable to her than those to which she was denied access. Such inferences are not appropriate at this stage of the litigation — a demurrer is not "the appropriate procedure for determining the truth of disputed facts or what inferences should be drawn where competing inferences are possible." (*CrossTalk Productions, Inc. v. Jacobson* (1998) 65 Cal.App.4th 631, 635.) Moreover, according to the complaint, upon information and belief, the age- and gender-restricted insurance ads were not part of a parallel ad campaign whereby Facebook delivered the same or similar ads to women and older people.[7] Liapes further identified several ads that did not appear to her on Facebook — she had to be "informed that she was denied such ads because of her age and/or gender." Because she did not receive these ads, she independently sought information about the insurance companies and services through the advertisers' websites, not Facebook. Her allegations sufficiently alleged an injury for standing purposes. (*Angelucci*, *supra*, 41 Cal.4th at p. 167.)

B.

Facebook next contends Liapes failed to state a claim under the Unruh Civil Rights Act. Facebook argues it does not engage in intentional discrimination; rather, it has neutral practices that, at most, have a disparate negative impact on the protected classes of gender and age. (*Koebke v. Bernardo Heights Country Club* (2005) 36 Cal.4th 824, 854

---

[7] We do not disregard these allegations, as Facebook urges, simply because they are based "upon information and belief." Allegations concerning matters " 'peculiarly within the knowledge of the adverse party,' " as is the case here, may be pleaded in this manner. (*Dey v. Continental Central Credit* (2008) 170 Cal.App.4th 721, 725, fn. 1.)

(*Koebke*).) Because the Unruh Civil Rights Act only reaches business practices that constitute intentional, invidious discrimination — not neutral practices that disparately impact protected groups — Facebook argues Liapes's claim is fatally flawed. (*Ibid*.) We disagree.

To state a claim under the Unruh Civil Rights Act, a plaintiff must allege the defendant is a business establishment that intentionally discriminates against and/or denies plaintiff full and equal treatment of a service, advantage, or accommodation based on plaintiff's protected status. (§§ 51, subd. (b), 51.5; *Candelore*, *supra*, 19 Cal.App.5th at pp. 1144–1146; *Martinez v. Cot'n Wash, Inc.* (2022) 81 Cal.App.5th 1026, 1036 ["Unless an Unruh Civil Rights Act claim is based on an [Americans with Disabilities Act of 1990] violation," a plaintiff must prove intentional discrimination].) Intentional discrimination requires " 'willful, affirmative misconduct.' " (*Koebke*, *supra*, 36 Cal.4th at p. 853.) And plaintiffs must allege more than the disparate impact of a facially neutral policy on a particular protected group. (*Id*. at p. 854.)

Construing the complaint liberally and drawing all reasonable inferences in favor of the asserted claims, Liapes has stated an Unruh Civil Rights Act claim. (*Regents*, *supra*, 220 Cal.App.4th at p. 558.) Facebook qualifies as a business establishment. (*White*, *supra*, 7 Cal.5th at p. 1032 [Unruh Civil Rights Act prohibits discrimination by online businesses].) And it does not dispute women and older people were categorically excluded from receiving various insurance ads — an admitted service of Facebook — on its platform. (*Candelore*, *supra*, 19 Cal.App.5th at p. 1152 [people are entitled to full and equal accommodations and services in all business establishments of every kind, including less essential commercial services].)

12

Liapes further alleged Facebook engaged in intentional discrimination by designing and employing ad tools that expressly make distinctions based on gender and age when creating the target audience for insurance ads. (*Koire v. Metro Car Wash* (1985) 40 Cal.3d 24, 35–36 [discount program for women violated Unruh Civil Rights Act because it singled-out customers based on protected class status, without any compelling societal interest].) Facebook, not the advertisers, classifies users based on their age and gender. Advertisers using the Audience Selection tool are *required* to identify the age and gender preferences for their target audience. While the default audience setting is 18 to 65 years of age and older and all genders, Facebook provides advertisers with the option of easily including or excluding entire groups from the target audience by checking categories on a drop-down menu. Moreover, Facebook encourages advertisers to target users based on age and gender. It urges advertisers to " '[t]hink about what [your customers] like, how old they are and the interests they have. This can help you identify audience options that will help you reach people like them on Facebook.' " Facebook explains, if " 'the majority of your current customers are women, it might be a good idea to set your audience to reach women and exclude men.' " And insurance advertisers allegedly excluded protected categories of persons — Liapes identified several insurance ads she did not receive because she was expressly outside the Audience Selection parameters for age or gender, thus requiring her to independently search for insurance opportunities. (See, e.g., *Smith v. BP Lubricants USA Inc.* (2021) 64 Cal.App.5th 138, 151 [allegation that employee made three racist comments to plaintiff was sufficient to allege intentional discrimination under Unruh Civil Rights Act].)

13

To the extent Facebook argues it was not responsible for any unequal treatment Liapes experienced because it merely followed the advertisers' selections, we disagree. The complaint alleged Facebook presents advertisers the opportunity to discriminate based on gender and age. (Cf. *Fair Housing Coun., San Fernando v. Roommates.com, LLC* (9th Cir. 2008) 521 F.3d 1157, 1164, 1167 (*Roommates*) [website could violate nondiscrimination laws by providing users the option to choose between nondiscriminatory and discriminatory preferences when searching for housing].) Facebook, rather than the advertisers, sends the ads to users within the Audience Selection parameters. Facebook retains the discretion and ability to approve and send an ad that includes age- or gender-based restrictions. Thus, Liapes alleged, whenever Facebook delivers an age- or gender-restricted ad, Facebook knowingly sends or publishes an ad that discriminates.

Allegations regarding the Lookalike Audience tool further indicate Facebook intentionally uses gender and age when targeting ads. For example, it is Facebook that creates the Lookalike Audience resembling the advertiser's sample audience. When analyzing the characteristics of the sample audience to determine the larger Lookalike Audience, Facebook directly relies on the users' age and gender. This occurs regardless of whether the advertiser has created a sample audience with age or gender exclusions. Thus, while an advertiser provides Facebook with the sample audience, "the rest of the work to create the Lookalike Audience is done entirely by Facebook," and it is that work that ultimately results in ad denial.

After the audience is selected, the ad-delivery algorithm — determining which users within a particular audience will receive ads — is no different. According to the complaint, both age and gender are weighted more heavily than other characteristics or data points. More importantly, Facebook uses

14

age and gender to determine who will receive the ads, regardless of whether the advertiser directs Facebook to limit the age or gender of recipients. Thus, even if advertisers do not limit their audience to a specific gender or age, *Facebook* makes those distinctions on behalf of advertisers via the ad-delivery algorithm. As a result, Liapes was unable to view several insurance ads, even when advertisers did not expressly exclude women and older people.

We agree with Liapes that the trial court erred when it disregarded her allegations about the algorithm. We discern no inconsistency between her allegations in the original complaint regarding the purpose of the ad-delivery algorithm — to optimize both the ad's audience and the advertiser's goals — and those in her first amended complaint — to increase the likelihood Facebook users will click on each ad because revenue increases when users click more often on ads. These allegations reinforce each other. Over 98 percent of Facebook's revenue comes from advertisers who pay to publish ads. According to the complaint, Facebook wants ads to be as " 'relevant' " as possible to ensure users spend more time on Facebook and allow it to sell and place more ads. Because Facebook increases its revenue when users engage with ads, it has the incentive to optimize the audience for those ads. These are not conflicting factual allegations and did not warrant the court's disregard. (*Panterra GP, Inc. v. Superior Court* (2022) 74 Cal.App.5th 697, 730 [if an amended complaint contains facts contradicting an earlier complaint in the same lawsuit, a court can take judicial notice of the inconsistent statements and disregard the conflicting factual allegations].)

More importantly, that the ad-delivery algorithm may serve a legitimate business interest, such as optimizing an ad's audience or connecting users to ads, is not fatal to Liapes's Unruh Civil Rights Act claim. "[L]egitimate business interests may justify limitations on consumer access to

15

public accommodations." (*Harris v. Capital Growth Investors XIV*, *supra*, 52 Cal.3d at p. 1162.) But while businesses can make economic distinctions in serving customers, those distinctions must be based on characteristics that "could conceivably be met by any customer" — not personal characteristics. (*Id*. at p. 1163.) For example, discounts based on gender violate the Unruh Civil Rights Act, but discounts "to any customer who meets a condition which any patron could satisfy (e.g., presenting a coupon, or sporting a certain color shirt or a particular bumper sticker)" are permissible. (*Koire v. Metro Car Wash*, *supra*, 40 Cal.3d at p. 36.) The "quest for profit maximization can never serve as an excuse for prohibited discrimination among potential customers." (*Candelore*, *supra*, 19 Cal.App.5th at p. 1153.) Thus, a defendant who pursues discriminatory practices motivated by " 'rational self-interest,' " such as economic gain, nonetheless violates the Unruh Civil Rights Act.[8] (*Marina Point, Ltd. v. Wolfson* (1982) 30 Cal.3d 721, 740–741, fn. 9.) On demurrer, the critical issue here is whether Liapes sufficiently alleged Facebook's ad platform discriminates against a protected class, such

---

[8] Distinctions, such as those based on age, are unlawful if they constitute " 'arbitrary, invidious or unreasonable discrimination.' " (*Javorsky v. Western Athletic Clubs, Inc.* (2015) 242 Cal.App.4th 1386, 1398.) Differential treatment is reasonable and nonarbitrary if there is a strong public policy in favor of the distinctions. (*Ibid*; *Sargoy v. Resolution Trust Corp.* (1992) 8 Cal.App.4th 1039, 1044 [bank offering older people savings accounts with higher interest rates was not arbitrary discrimination because it served policy considerations such as elderly people having limited incomes, inability to work due to health problems as articulated in a myriad of statutes].) Facebook does not argue its allegedly discriminatory ad platform is justified by any public policy.

as women and older people, even if in pursuit of those legitimate business goals. We conclude she has.[9]

The foregoing makes clear that Liapes alleged intentional discrimination, not disparate impact as Facebook asserts. Disparate impact analysis "relies on the *effects* of a facially neutral policy on a particular group." (*Koebke*, *supra*, 36 Cal.4th at p. 854.) Specifically, it requires inferring discriminatory intent solely from those effects. (*Ibid*.) Here, by contrast, Liapes alleged Facebook crafted tools such as the Lookalike Audience and ad-delivery algorithm that expressly rely on users' age and gender; i.e., they are not facially neutral. Those characteristics are then used to exclude women and older people from receiving insurance ads. Finally, while a disparate impact analysis does not apply to Unruh Civil Rights Act claims, nothing precludes "the admission of relevant evidence of disparate impact in Unruh Act cases" because it "may be probative of intentional discrimination." (*Harris v. Capital Growth Investors XIV*, *supra*, 52 Cal.3d at p. 1175.) Such evidence exists here — Liapes alleged Facebook's ad platform has a significant skew in delivery along gender lines. Combined with allegations that Facebook expressly relies on gender and age to determine the

---

[9] In disputing this conclusion, Facebook refers repeatedly to information outside the pleadings. For example, Facebook asserts its policies expressly forbid advertisers from discriminating based on protected attributes. And it further suggests that Liapes might have received parallel ads that "may well" have been "more 'valuable' " to her. Finally, Facebook asserts Liapes's references to its training materials have been taken out of context. Whatever the merits of these arguments may be, Facebook ignores that, on demurrer, we test the pleadings alone. (*SKF Farms v. Superior Court* (1984) 153 Cal.App.3d 902, 905.) The only issue "is whether the complaint, as it stands, unconnected with extraneous matters, states a cause of action." (*Ibid*.) Facebook should rest assured it will be able to develop the record and its arguments further — just not at this stage of the litigation.

audience for its ads, the complaint raises a plausible inference Facebook treated Liapes unequally because of her gender and age — a valid Unruh Civil Rights Act claim of intentional discrimination by a business establishment. (*Doheny Park Terrace Homeowners Assn., Inc.* v. *Truck Ins. Exchange* (2005) 132 Cal.App.4th 1076, 1099.)

C.

Facebook also contends Liapes failed to state an Unruh Civil Rights Act claim under an aiding and abetting theory of liability because she does not adequately allege it acted with an intent to facilitate discriminatory conduct. We disagree.

A person who aids and abets the commission of an offense, such as an intentional tort, may be liable if the person " 'knows the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other to so act' " or " 'gives substantial assistance to the other in accomplishing a tortious result and the person's own conduct, separately considered, constitutes a breach of duty to the third person.' " (*Fiol v. Doellstedt* (1996) 50 Cal.App.4th 1318, 1325–1326.) A person can be liable for aiding and abetting violations of civil rights laws. (Cf. *Alch v. Superior Court* (2004) 122 Cal.App.4th 339, 389 [aiding and abetting theory of liability applies to Fair Employment and Housing Act claims].)

The complaint satisfied these elements. It adequately alleged Facebook knew insurance advertisers intentionally targeted its ads based on users' ages and gender — as explained above, a violation of the Unruh Civil Rights Act. (*Casey v. U.S. Bank Nat. Assn.* (2005) 127 Cal.App.4th 1138, 1149 [requiring plaintiff to first identify the violation for which plaintiff seeks to hold defendant liable].) According to Liapes, the coding in Facebook's platform identifies each type of business, including insurance advertisers,

18

that purchases ads.  In addition, Facebook is aware of the ad's subject matter, including insurance ads.  Facebook was aware ads contained age- or gender-based restrictions because it alone approved and sent the ads to the target audience.  (*Schulz v. Neovi Data Corp.* (2007) 152 Cal.App.4th 86, 94 [allegation defendant knew they were facilitating orders for unlawful pyramid scheme satisfied knowledge requirement for aiding and abetting claim].)  Thus, Liapes alleged, Facebook knew older people and women were being discriminated against with regard to the provision of insurance ads.  (*Casey v. U.S. Bank Nat. Assn.*, *supra*, 127 Cal.App.4th at p. 1145 [liability for aiding and abetting depends on proof the defendant had actual knowledge of the specific primary wrong the defendant substantially assisted].)

The complaint also sufficiently alleged the element of substantial assistance or encouragement.  (*Fiol v. Doellstedt*, *supra*, 50 Cal.App.4th at p. 1326.)  Each time an advertiser used the Audience Selection tool and made a discriminatory targeting decision based on age or gender, Facebook followed the selected audience parameters.  Indeed, this occurred despite Facebook retaining the discretion to reject ads that include age- or gender-based restrictions.  Facebook further maintained the age and gender Audience Selection criteria despite its awareness advertisers were making discriminatory advertising choices.  (*Schulz v. Neovi Data Corp.*, *supra*, 152 Cal.App.4th at p. 94 [defendant substantially assisted and encouraged illegal conduct by allowing configuring of website to authorize processing of credit card payments].)  Although the default setting for the Audience Selection tool is for all genders and people over the age of 18, Facebook encourages advertisers to narrow the gender of the users who will receive ads to make them more effective.  In one instance, Facebook stated if " 'the

19

majority of your current customers are women, it might be a good idea to set your audience to reach women and exclude men.' "

Facebook nonetheless argues Liapes must also plead it had the *specific intent* to facilitate the advertisers' Unruh Civil Rights Act violations. (See, e.g., *Gerard v. Ross* (1988) 204 Cal.App.3d 968, 983.) We need not decide whether this is a required element for aiding and abetting liability — read liberally, the complaint alleges Facebook intended to assist the insurance advertisers in excluding women and older people from receiving their ads. (*Nasrawi v. Buck Consultants LLC* (2014) 231 Cal.App.4th 328, 345.) Liapes alleged Facebook encourages, facilitates, expects, and wants advertisers to routinely exclude older persons and women from their Audience Selections so they will not receive ads on insurance opportunities. "Fairly read, that allegation indicates intent to participate" in the illegal activity. (*Ibid.*)

In sum, the trial court erred in sustaining Facebook's demurrer to Liapes's complaint.

## II.

Liapes contends section 230 does not immunize Facebook from liability because it acted as a content provider. We agree.

Section 230 "immunizes providers of interactive computer services against liability arising from content created by third parties." (*Roommates*, *supra*, 521 F.3d at p. 1162, fn. omitted.) It states, in relevant part, "[n]o provider or user of an interactive computer service" — meaning "any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server" — shall "be treated as the publisher or speaker of any information provided by another information content provider." (47 U.S.C. § 230, subds. (c)(1), (f)(2).) These provisions convey "an intent to shield Internet intermediaries from the

20

burdens associated with defending against state law claims that treat them as the publisher or speaker of third party content." (*Hassell v. Bird* (2018) 5 Cal.5th 522, 544.) " 'The prototypical service qualifying for [CDA] immunity is an online messaging board (or bulletin board) on which Internet subscribers post comments and respond to comments posted by others.' " (*Dyroff v. Ultimate Software Group, Inc.* (9th Cir. 2019) 934 F.3d 1093, 1097, brackets in original.)

But an interactive computer service provider only has immunity if it is *not* also the information content provider — that is, someone "responsible, in whole or in part, for the creation or development" of the content at issue. (47 U.S.C. § 230, subd. (f)(3); *Roommates, supra*, 521 F.3d at p. 1162.) Passively displaying content "created entirely by third parties" renders the operator only a service provider "with respect to that content." (*Roommates*, at p. 1162.) "But as to content that it creates itself, or is 'responsible, in whole or in part' for creating or developing, the website is also a content provider." (*Ibid*.) "Thus, a website may be immune from liability for some of the content it displays to the public but be subject to liability for other content." (*Id*. at pp. 1162–1163.)

*Roommates* — concluding a website matching people renting spare rooms with others seeking housing was not entitled to section 230 immunity — is instructive. (*Roommates, supra*, 521 F.3d at p. 1165.) The website required users to state the gender, sexual orientation, and familial status of their desired tenants. (*Id*. at p. 1161.) The website operator then used those preferences to determine which postings were shown to other users based on their selections from drop-down menus and pre-populated lists. (*Id*. at pp. 1161–1162, 1165.) By eliciting information about protected characteristics and thereafter using that information to

determine postings other users could view, the website operator was partially responsible for the development of allegedly illegal content. (*Id*. at pp. 1165, 1167.) The court concluded section 230 "does not grant immunity for inducing third parties to express illegal preferences." (*Roommates*, at p. 1165.)

There is little difference with Facebook's ad tools. Like the website at issue in *Roommates*, Facebook requires users to disclose their age and gender before they can use its services. (*Roommates*, *supra*, 521 F.3d at p. 1161.) It designed and created an advertising system, including the Audience Selection tool, that allowed insurance companies to target their ads based on certain characteristics, such as gender and age. (*Vargas v. Facebook, Inc.* (9th Cir., June 23, 2023, No. 21-16499) 2023 U.S.App. Lexis 15796 (*Vargas*); *Roommates*, at p. 1161; *Allen v. City of Sacramento* (2015) 234 Cal.App.4th 41, 64, fn. 4 [authorizing citation and reliance on unpublished federal court decisions as persuasive authority].) Although there are thousands of characteristics advertisers may choose to identify their target audiences, Facebook *requires* advertisers to select age and gender parameters. Each category includes "simple drop-down menus and toggle buttons to allow" insurance advertisers "to exclude protected categories of persons." (*Vargas,* 2023 U.S.App. Lexis 15796, p *7; *Roommates*, at p. 1161.) Insurance advertisers then "allegedly used the tools to exclude protected categories of persons from seeing some advertisements." (*Vargas,* 2023 U.S.App. Lexis 15796, p. *7.) Facebook "identified persons in protected categories and offered tools that directly and easily allowed advertisers to exclude all persons of a protected category (or several protected categories)." (*Vargas,* 2023 U.S.App. Lexis 15796, p. *9.) In doing so, Facebook does not merely proliferate and disseminate content as a publisher. (*Kimzey v. Yelp! Inc.* (9th

22

Cir. 2016) 836 F.3d 1263, 1271.) It creates, shapes, or develops content "by materially contributing" to the content's alleged unlawfulness. (*Roommates*, at pp. 1167–1168.)

These circumstances are distinguishable from those in *Prager University v. Google LLC* (2022) 85 Cal.App.5th 1022. In that case, the defendant video sharing website restricted access to videos based on certain criteria regarding the content, such as talking about drug use or abuse, overly detailed conversations or depictions of sexual activity, and inappropriate language. (*Id.* at p. 1029.) The plaintiff alleged defendant violated the Unruh Civil Rights Act, among other statutes, by restricting access to the plaintiff's generally politically conservative videos based on its political viewpoint rather than the content falling into any restricted categories. (*Prager*, at p. 1033.) The court determined the plaintiffs were challenging the defendants' editorial decisions regarding restricting, restraining, and censoring content — all traditional publication decisions to which section 230 immunity attached. (*Prager*, at p. 1033.) There were no allegations, as here, that the defendant created a system that actively shaped the audience based on protected characteristics.

Facebook's Lookalike Audience tool and ad-delivery algorithm underscore its role as a content developer. According to the complaint, Facebook uses its internal data and analysis to determine what specific people will receive ads. The algorithm relies heavily on age and gender to determine which users will actually receive any given ad. This occurs even if an advertiser did not expressly exclude certain genders or older people. The algorithm then sends or excludes users from viewing ads based on protected characteristics such as age and gender. Because the algorithm ascertains data about a user and then targets ads based on the users' characteristics,

23

the algorithm renders Facebook more akin to a content developer. (*Vargas*, *supra*, 2023 U.S.App. Lexis 15796, p. *8.) Facebook is not entitled to section 230 immunity for the claims here.

Disputing this conclusion, Facebook argues its ad tools are neutral because third parties, not Facebook, create the allegedly illegal content. True, providing neutral tools to users to make illegal or unlawful searches does not constitute " 'development' " for immunity purposes. (*Roommates*, *supra*, 521 F.3d at p. 1169.) But the system must do " 'absolutely nothing to enhance' " the unlawful message at issue "beyond the words offered by the user." (*Kimzey v. Yelp! Inc.*, *supra*, 836 F.3d at p. 1270.) For example, "a housing website that allows users to specify whether they will or will not receive emails by means of *user-defined* criteria might help some users exclude email from other users of a particular race or sex." (*Roommates*, at p. 1169.) "However, that website would be immune, so long as it does not *require* the use of discriminatory criteria." (*Ibid.*, italics added.) Here, Liapes alleged Facebook "does not merely provide a framework that could be utilized for proper or improper purposes." (*Roommates*, at p. 1172.) Rather, Facebook, after requiring users to disclose protected characteristics of age and gender, relied on "unlawful criteria" and developed an ad targeting and delivery system "directly related to the alleged illegality" — a system that makes it more difficult for individuals with certain protected characteristics to find or access insurance ads on Facebook. (*Id.* at pp. 1167, 1172; compare with *Carafano v. Metrosplash.com, Inc.* (9th Cir. 2003) 339 F.3d 1119, 1125 [website operator was not involved with user's decision to enter a fake profile in a dating service, the illegal activity at issue]; *Dyroff v. Ultimate Software Group, Inc.*, *supra*, 934 F.3d at p. 1099 [website entitled to § 230 immunity from claims it permitted trafficking illegal narcotics where recommendation

24

and notification functions were based off of information users provided in blank text boxes rather than a requirement that users disclose certain characteristics].) That third-party advertisers are the content providers does not preclude Facebook "from *also* being an information content provider by helping 'develop' at least 'in part' the information" at issue here, contrary to Facebook's assertions. (*Roommates*, at p. 1165 ["the party responsible for putting information online may be subject to liability, even if the information originated with a user"].)

## DISPOSITION

We conclude, liberally construing the complaint and drawing all reasonable inferences in favor of its claims, Liapes alleged facts sufficient to state a cause of action. The judgment is reversed. Liapes is entitled to her costs on appeal.

_____

Rodríguez, J.

WE CONCUR:


_____

Tucher, P. J.


_____

Fujisaki, J.


A164880

Trial Court: San Mateo County Superior Court

Trial Judge: Hon. V. Raymond Swope

Counsel:

Gupta Wessler, Jennifer D. Bennett, Linnet Davis-Stermitz, Peter Romer-Friedman, Matthew W.H. Wessler; Law Offices of William Most, William Brock Most; Aqua Terra Aeris Law Group, Jason R. Flanders; Outten & Golden, Jahan C. Sagafi, Adam T. Klein, Pooja Shethji; Peter Romer-Friedman Law and Peter Romer-Friedman for Plaintiffs and Appellants.

David Brody, Jon Greenbaum, Sanaa Ansari; Amanda Goad; Olga Akselrod, Linda S. Morris; and Jacob Snow for Lawyers' Committee for Civil Rights Under Law, ACLU Foundation of Southern California, ACLU Foundation, ACLU Foundation of Northern California and Upturn as Amici Curiae on behalf of Plaintiffs and Appellants.

Gibson, Dunn & Crutcher, Rosemarie T. Ring, Ryan Azad, Theodore J. Boutrous, Jr., Bradley J. Hamburger and Matt Aidan Getz for Defendant and Respondent.